# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Steele v. Provena Hospitals*, 2013 IL App (3d) 110374

---

| | |
|---|---|
| Appellate Court Caption | RITA STEELE, Special Administrator of the Estate of Michelle Koenig, Plaintiff-Appellee, v. PROVENA HOSPITALS, d/b/a St. Mary's Hospital; TIMOTHY MORAN, M.D.; and ECHO MANAGEMENT AND CONSULTING GROUP, LLC, Defendants-Appellants. |
| District & No. | Third District<br>Docket Nos. 3-11-0374, 3-11-0375 cons. |
| Rule 23 Order filed<br>Motion to<br>publish allowed<br>Opinion filed | June 18, 2013<br><br>September 24, 2013<br>September 24, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the judgment entered against decedent's emergency room physician and the hospital where the physician worked based on plaintiff's allegation of medical negligence, the judgment against the physician was reversed and remanded for a new trial on the ground that the trial court erred in admitting the testimony of three lay witnesses that decedent had a rash that "looked like chicken pox," since the testimony was irrelevant, it was tantamount to a medical diagnosis, and plaintiff mischaracterized the description during the cross-examination of defendant's expert, and, further, the judgment against the hospital was reversed based on plaintiff's failure to prove decedent's reliance on the hospital or on the employee status of anyone treating her in the emergency room. |
| Decision Under Review | Appeal from the Circuit Court of Kankakee County, No. 07-L-18; the Hon. Kendall Wenzelman, Judge, presiding. |

| Judgment | No. 3-11-0374, judgment notwithstanding the verdict entered. |
| | No. 3-11-0375, reversed and remanded. |
| | |
| Counsel on Appeal | Nancy G. Lischer (argued), of Hinshaw & Culbertson, of Chicago, and Dan Softcheck, of Hinshaw & Culbertson, of Joliet, for appellant Provena Hospitals. |
| | |
| | Trisha K. Tesmer (argued), of Cassiday Schade LLP, of Chicago, for other appellants. |
| | |
| | Michael W. Rathsack (argued) and Michael Cogan, of Cogan & Power, P.C., both of Chicago, for appellee. |
| | |
| Panel | JUSTICE McDADE delivered the judgment of the court, with opinion. Presiding Justice Wright and Justice Schmidt concurred in the judgment, with opinion. |

**OPINION**

¶ 1        Rita Steele, plaintiff and special administrator for the estate of Michelle Koenig, filed suit against emergency room doctor Timothy Moran and his employer, Echo Management and Consulting, for the wrongful death of her daughter, Michelle, due to alleged medical negligence. She also sued Provena Hospitals, d/b/a St. Mary's Hospital, alleging that Moran acted as its agent and it was, therefore, vicariously liable for her daughter's death. The jury rendered a verdict awarding Steele, Todd Koenig, Michelle's father, and Jessica Watts, Michelle's half-sister, $1.5 million. Provena and Moran have both appealed. We reverse and remand on Moran's appeal and enter judgment notwithstanding the verdict in favor of Provena.

¶ 2                                    FACTS
¶ 3                        I. Michelle's Recent Medical History
¶ 4        On January 13, 2006, Michelle went to the office of her primary care physician, Dr. Gregory Trapp, complaining of a sore throat and cough. His nurse-practitioner ordered a throat culture, which was positive for streptococcus infection. Michelle was prescribed an antibiotic, amoxicillin, and did not subsequently return to Dr. Trapp's office.

¶ 5        On February 9, 2006, Michelle began to feel ill at work. Her symptoms included

difficulty speaking and partial paralysis on her right side. She was picked up from work and taken home by her mother, but later that day was transported by ambulance to Riverside Hospital in Kankakee, where she was seen and evaluated by Dr. Trapp, her personal internist. Dr. Trapp performed a physical examination and initially thought she had suffered a stroke, blood clot, or cranial bleed. He ordered tests, which he and a consulting neurologist, Dr. Bruce Dodt, thought supported a diagnosis of multiple sclerosis. He arranged for Michelle's transfer from Riverside to the Chicago Institute of Neurology and Neurosurgery (CINN), where she underwent a number of tests, including a spinal tap requiring a lumbar puncture. The doctors at CINN diagnosed either presumptive multiple sclerosis (which they described to Dr. Trapp as rapidly progressing) or lupus. They began a course of steroids while she was hospitalized and discharged her on February 13 or 14 with instructions to continue on steroids, starting with a daily dose of 60 milligrams of prednisone and tapering to 40 milligrams per day by February 22. She was to return to CINN for further treatment.

¶ 6      On Sunday, February 19, Michelle began experiencing severe back pain and a cough. At the insistence of her mother, Rita, Michelle was taken by ambulance to St. Mary's Hospital for emergency treatment. Upon arrival at the hospital, Michelle was given a consent-to-treatment form to sign. Although neither she nor Rita read the form, Rita printed her daughter's name and directed Michelle to sign it.

¶ 7      Michelle was treated by Dr. Timothy Moran in the emergency department at St. Mary's. He was provided with Michelle's medical history, including her current use of steroids and the recent diagnosis of presumptive multiple sclerosis/lupus and the fact that she had had chicken pox. Michelle's chief complaint in emergency on February 19 was back pain which limited her ability to get around. She told Dr. Moran that she had recently undergone a lumbar puncture.

¶ 8      Dr. Moran performed a physical examination and he treated her back pain with both a pain medication and a muscle relaxant, which relieved her discomfort enough for Michelle to walk around and to use the bathroom on her own. Moran also ordered several diagnostic tests, including blood work, chemistry and metabolic testing, urinalysis and lumbar spine X-rays. He consulted with Dr. Leonard Cerullo, one of Michelle's physicians at CINN, and learned from him that the results of her tests at CINN were still incomplete. He also spoke with Dr. Khan, an internist who was on call for Dr. Trapp but who declined to come to the emergency room, instead advising that Michelle should see Dr. Trapp in the office the following day.

¶ 9      During his examination, Dr. Moran observed a rash on Michelle's head, chin, chest and upper back, which he described as "scattered red papular vesicular lesions." A papular lesion is a raised lesion or red bump, and a vesicle is a small blister within the skin. Dr. Moran later testified that he did not think this rash looked like chicken pox because Michelle did not have the dry and crusty lesions he believed she would have exhibited if the virus had developed within the past 24 hours, and they were not itching.

¶ 10      Results of the testing showed she had no fever, her urinalysis was negative for nitrites, leukocyte esterase, significant protein and blood. She did have a white blood cell count of 19,000 and her liver enzymes were somewhat elevated. Although Dr. Moran noted the

elevated enzymes, he formed "no opinion" at that time as to the reason for the elevation, nor did he know that chicken pox could be a cause.

¶ 11 Dr. Moran released Michelle that same night with instructions to continue the pain medication and muscle relaxant, to follow up with Dr. Trapp the next day (Monday), and with Dr. Cerullo at CINN as previously scheduled.

¶ 12 Michelle did not see Dr. Trapp during the day on Monday, but at 6:40 p.m. on that evening, February 20, she again presented for emergency care, this time at Riverside where she had been evaluated on February 9. She was again complaining of back pain and abdominal discomfort/nausea.

¶ 13 (The following portion of Michelle's medical history, set forth in paragraphs 14 through 18, was deemed irrelevant to the standard of care and was excluded from the jury by order of the trial court. The information is summarized from the deposition testimony of Dr. Manczko, Dr. Trapp, and Dr. Ramani. We include it here because it forms the basis of a significant issue on appeal.)

¶ 14 At Riverside, Michelle was first seen by emergency department physician Dr. Thaddeus Manczko. Because he had no independent recollection of these events, his deposition testimony was drawn from his notes and the hospital's comprehensive chart. Manczko said Michelle presented with radiating pain in her lower back and abdominal discomfort. He observed residual right-side weakness, some symptoms of mild dehydration and of infection, bruising around the lumbar puncture site, and pale skin, and he specifically noted "no skin lesions to suggest shingles." He called in Dr. Trapp because, as Michelle's primary care physician, he would be able to admit her to the hospital if that became necessary.

¶ 15 Tests were ordered on February 20–some by Manczko and some by Trapp–which showed a white blood cell count that had more than doubled from the 19,000 finding at St. Mary's to 39,000 and liver enzymes that had dramatically increased.[1] Manczko thought these results were consistent with infection but could also result from stress, medication, hepatitis, or inflammation (epidural abscess). He stated he could not base a final or ultimate diagnosis on that information alone, nor was he, as an emergency room physician, in a position to rule out multiple sclerosis or viral infection as the cause of her symptoms. In light of the incomplete information available to him, he made a primary diagnosis of abdominal pain, a secondary diagnosis of low back pain, and noted a need to rule out an epidural abscess resulting from lumbar puncture.

¶ 16 After being called in, Dr. Trapp assumed the triaging function and primary responsibility for Michelle's treatment. He secured consults with three specialists: Dr. Ed Jerkovic (gastrointestinal), Dr. Bruce Dodt (neurology), and Dr. Ram Ramani (infectious diseases). Dr. Ramani did not examine Michelle until Tuesday (February 21), and by then her white blood cell count had risen to 50,000 and her liver enzymes had escalated still further.[2] When

_____

[1]On February 19, her AST/SGOT was 80 and her AFT/SGPT was 97.
 On February 20, her AST/SGOT was 1,364 and her AFT/SGPT was 986.

[2]On February 21, her AST/SGOT was 2,870 and her AFT/SGPT was 1,778.

asked during his deposition whether he was comfortable with his diagnosis of her at Riverside, Dr. Trapp responded:

> "We were unsure what caused it, but the concern was that the liver was failing in front of our eyes. Her numbers multiplied by thousand-fold in 12-15 hours. And she was showing signs of not just that, but the synthesis or the function of the liver was also failing."

¶ 17    All four doctors were extremely concerned by the combination of Michelle's escalating liver enzymes and white blood cell count, her "strange" multiple sclerosis diagnosis, and the declining function of her liver. Dr. Jerkovic insisted that she be airlifted to Northwestern Memorial Hospital because he believed she needed an immediate liver transplant and she had a better chance of moving to the top of the transplant list there than at Riverside.

¶ 18    Dr. Ramani, the infectious disease specialist, included in the "impressions" in his report the need for a Tzanck smear and a "herpes PCR" to rule out herpes. He also considered acute hepatitis, noting that "liver function rates were normal 2 days ago [February 19]" and suggesting such hepatitis could be "possibly related to medications and steroids." The third "recommendation" in Dr. Ramani's report was "IV acyclovir to be discussed and decided upon." Neither he nor any other of the doctors who examined and treated Michelle at Riverside diagnosed disseminated varicella zoster or recognized her rash as any form of chicken pox.

¶ 19    (This is the end of the recitation of excluded factual evidence.)

¶ 20    On February 21, 2006, Michelle was transported to Chicago but was dead on arrival at Northwestern Memorial Hospital. An autopsy determined the cause of death was systemic failure caused by disseminated varicella zoster infection.

¶ 21                                    II. Procedural History

¶ 22    On July 19, 2007, Rita Steele, as special administrator of Michelle's estate, filed suit against Dr. Moran and his employer, Echo Management and Consulting, alleging the wrongful death of her daughter due to medical malpractice and a survival action. At issue was whether Dr. Moran breached the standard of care that he, as an emergency room physician, owed to Michelle and, if so, whether that breach was a proximate cause of her death.

¶ 23    If plaintiff has sustained her burden of proof on this issue, she also has the burden of proving (1) current and potential damages to the members of Michelle's family attributable to her death (wrongful death action), and (2) damages sustained by Michelle and payable to her estate for pain and suffering attributable to the breach (survival action).

¶ 24    Steele also sued Provena Hospitals, d/b/a St. Mary's Hospital, alleging Dr. Moran was its agent and it was, therefore, vicariously liable for Michelle's death. At issue in this claim is whether Provena held Dr. Moran out as its agent (actual agency) or whether Michelle or someone lawfully acting as her agent reasonably relied on a reasonably held belief that he was the hospital's agent (apparent agency).

¶ 25    In preparation for trial, the parties filed disclosures pursuant to Illinois Supreme Court

Rule 213 (eff. Jan. 1, 2007). Some of those disclosures were the focus of evidentiary challenges during trial. Dr. Moran's Rule 213(f)(3) disclosures indicated that he would testify from the St. Mary's hospital medical records, and any reasonable inferences therefrom, about his care and treatment of Michelle on February 19, 2006, and any knowledge and observations he had surrounding the occurrence of Michelle's admission to St. Mary's. Dr. John Segreti, an infectious disease expert proffered by the defendants, included in his Rule 213(f)(3) disclosures that he would not be rendering an opinion on the standard of care of an emergency room doctor. Steele's Rule 213(f)(1) disclosures indicated that she would be providing lay testimony about the facts and circumstances concerning the care and treatment of Michelle at St. Mary's on February 19, 2006, and her memory of the events and treatment prior to Michelle's death, including conversations with medical personnel and observations she made at that time.

¶ 26      Before trial, the court issued the following rulings on specific motions *in limine* pertinent to this appeal: (1) barring Steele from eliciting opinions outside those disclosed in her Rule 213 disclosures or expert depositions; (2) barring the defendants from calling subsequent treating physicians and introducing evidence of subsequent treatment at Riverside Hospital in Kankakee, specifically the fact that no doctor at Riverside diagnosed Michelle's chicken pox or disseminated varicella zoster infection; (3) barring the defendants from presenting testimony from doctors who treated Michelle at a medical facility in Chicago about the diminished quality of life of a person with multiple sclerosis; (4) barring testimony from Dr. Moran as to why Michelle's liver enzymes were high because such testimony was not presented during his deposition; (5) permitting testimony about Michelle's future plans to go to community college; (6) barring the defendants from presenting a sole proximate cause defense because Moran presented no evidence to support this theory; (7) permitting certain of plaintiff's lay witnesses to testify that Michelle's rash "looked like chicken pox"; and (8) barring the defendants from presenting testimony from Michelle's grandmother that Steele "gave up parental rights of Michelle Koenig from ages fourteen to eighteen."

¶ 27      The case was tried to a jury. Dr. Moran was called by both sides. Kristen Bien, Michelle's friend; Jacqueline Boomsma, the emergency medical technician (EMT) who transported Michelle to St. Mary's; and Rita Steele all testified that Michelle had a rash that "looked like chicken pox." Steele testified as an occurrence witness to the events surrounding Michelle's treatment in the emergency room at St. Mary's and was also allowed to testify on the agency issue. She–along with Michelle's father, Todd Koenig, and her half-sister, Jessica Watts–provided evidence of their loss-of-society damages resulting from Michelle's death. Plaintiff called two experts–Dr. Fred Zar, an infectious disease specialist, and Dr. Robert Mulliken, an emergency room physician–to testify to the nature and breach of Dr. Moran's standard of care.

¶ 28      Dr. Moran called as his experts Dr. John Ortinau, an emergency room doctor, who testified that the standard of care was not breached, and Dr. John Segretti, an infectious disease specialist, who was offered solely on the issue of proximate cause and who testified that nothing Dr. Moran did or did not do on February 19 could have led to a different result.

¶ 29      Dr. Moran also made an offer of proof outside the presence of the jury presenting evidence through live testimony and depositions of (1) Michelle's subsequent treatment at

Riverside on February 20 and 21 and (2) the fact that none of the several doctors who evaluated and treated her had diagnosed either chicken pox or disseminated varicella zoster infection. As part of this offer of proof, Drs. Zar and Mulliken (plaintiff's experts) testified that they reviewed Michelle's February 20 and 21 records from Riverside and learned that no doctor there had diagnosed her with chicken pox or disseminated varicella zoster. The purpose of the offer of proof was to preserve for review the trial court's refusal to allow this evidence to be heard by the jury.

¶ 30    The jury rendered a verdict in favor of plaintiff and against all defendants in the amount of $1,500,000.

¶ 31    Provena and Moran filed separate appeals which have been consolidated in this court. Fifteen issues are raised by Moran and six by Provena. Any necessary additional facts will be presented and discussed in our consideration of these issues.

¶ 32                                                    ANALYSIS

¶ 33                              I. Appeal of Dr. Moran, No. 3-11-0375

¶ 34                 A. Evidentiary Issues Related to Alleged Medical Negligence

¶ 35    In general, evidence must be legally relevant to be admissible. *People v. Kirchner*, 194 Ill. 2d 502, 539 (2000). Evidence is relevant if it has a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than without the evidence. *Ford v. Grizzle*, 398 Ill. App. 3d 639, 646 (2010). We review a trial court's ruling on matters of evidence for an abuse of discretion. *Gunn v. Sobucki*, 216 Ill. 2d 602, 609 (2005).

¶ 36                 1. Lay testimony that rash "looked like chicken pox"

¶ 37    We consider first Dr. Moran's challenge to the trial court's decision to allow three lay witnesses–Rita Steele, Kristen Bien, and Jacqueline Boomsma–to testify that Michelle's rash "looked like chicken pox." He contends the testimony was tantamount to a medical judgment, was unwarranted, and was unfairly prejudicial. He also challenges allowing plaintiff's counsel to comment on that testimony in a later examination, over his objection, and in closing argument.

¶ 38    Steele argues that Dr. Moran did not properly preserve this issue for appellate review and it is, therefore, forfeited.

¶ 39    For the reasons that follow, we find that the issue has not been forfeited and that the decision to allow the testimony as framed was reversible error.

¶ 40    With regard to the forfeiture issue, a party may not rely on a court's ruling on a motion *in limine* to preserve an error for appellate review. *Cunningham v. Millers General Insurance Co.*, 227 Ill. App. 3d 201 (1992). Thus the party contesting the testimony must object the first time the testimony is introduced. *Cunningham*, 227 Ill. App. 3d at 206. In the absence of a proper objection, the matter is forfeited. *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 163 Ill. 2d 498, 502 (1994).

¶ 41    Here the record indicates that before Bien and Boomsma testified, Dr. Moran renewed

his objection to any mention that Michelle's rash looked like chicken pox. On the day that Steele testified, the court stated that its prior rulings remained in effect concerning the motions *in limine* and that if the parties felt it necessary "to step up and put it in the record again, that [was] fine." We understand the court's statement to be a reiteration of its ruling that it would allow that testimony in. On these facts, we find this issue has not been forfeited for purposes of appellate review.

¶ 42        Similarly, Dr. Moran objected repeatedly to the use of the testimony of these witnesses that the rash "looked like chicken pox" in the examination of one of his experts, Dr. Ortinau.

¶ 43        However, with regard to Dr. Moran's complaint that plaintiff's counsel expressly and improperly characterized this testimony as a "diagnosis" of chicken pox during closing argument, we find that no contemporaneous objection was made and that this claim has been forfeited. We note that the trial court later attempted to cure the improper argument by instruction to the jury.

¶ 44        Turning now to the merits of the issue which was preserved, we consider first the nature of the testimony. Each of the three women was allowed to testify that the rash "looked like chicken pox." We believe this decision was error for three reasons.

¶ 45        First, we question the relevance of their testimony to any element of the negligence claim. The conclusion of three witnesses, without medical training, that the rash "looked like chicken pox" is irrelevant to a determination of the proper standard of care, Dr. Moran's possible breach of that standard, or whether any breach by Dr. Moran was the proximate cause of Michelle's death. While their contention that the rash "looked like chicken pox" has little or no probative value, it does pose a substantial risk, just standing alone, of unfair prejudice.

¶ 46        Second, defendant challenges the testimony as tantamount to a medical diagnosis; plaintiff responds that it is merely a description of the rash. We believe defendant's characterization of the testimony to be more accurate.

¶ 47        A "description" of the rash would be, for example, it was flat or raised, pink or red, blistery or solid, clustered or isolated, hot or cool to the touch, etc. Instead, each witness's attestation that it "looked like chicken pox" was, in essence, an assurance to the jurors that (1) she knew what chicken pox rash looked like, and (2) she was able to conclusively distinguish it, as indicative of chicken pox, as opposed to the myriad other rashes which can appear on the human body. Such implicit assurances were clearly without basis with regard to two of the witnesses in light of Bien's admission that, other than having had chicken pox as a child, she had never seen a rash like that one and Boomsma's affidavit that she had no training in diagnosing diseases.

¶ 48        We note that these witnesses were neither tendered nor qualified as experts by plaintiff; they were lay witnesses. A lay witness may offer opinion testimony provided that it is helpful to a clear understanding of her testimony or a determination of a fact at issue. *Freeding-Skokie Roll-Off Service, Inc. v. Hamilton*, 108 Ill. 2d 217, 222-23 (1985) (citing Fed. R. Evid. 701(b)). The opinion testimony of a lay witness must also be rationally based on the witness's perception. *Hopkinson v. Chicago Transit Authority*, 211 Ill. App. 3d 825, 846 (1991). However, a lay witness may not offer testimony pertaining to a specific medical

diagnosis unless he or she is properly qualified as an expert to give such testimony. See *Robinson v. Wieboldt Stores, Inc.*, 104 Ill. App. 3d 1021, 1026-27 (1982).

¶ 49    Because we find that the testimony is the functional equivalent of a medical diagnosis, we conclude that the trial court erred in allowing the witnesses to frame their testimony in this manner.

¶ 50    Third, in addition to the testimony itself, the record shows that plaintiff was allowed, over multiple objections by defendant, to mischaracterize that description when examining defendant's expert, Dr. Ortinau. Plaintiff's counsel finessed their testimony as a diagnosis not only of chicken pox, but also "varicella zoster virus" and "*disseminated* varicella zoster virus" (emphasis added) well before closing argument, as follows:

> "Q. You recall Ms. Steele saying the rash looked like chicken pox, correct?
>
> A. Yes.
>
> Q. *It turns out that Ms. Boomsma, Ms. Bien, and Ms. Steele are correct that, in fact, Michelle did have a varicella zoster virus rash on February 19th, 2006. True?*
>
> [Defense counsel objected to this question, but the court overruled the objection.]
>
> A. Um, based on the fact that we know what ultimately happened to Ms. Koenig, that is a true statement. That's correct.
>
> Q. All three of them were correct in their description of the rash in terms of looking like chickenpox, true?
>
> A. *Well, I don't know if they're correct in what they said about the rash. What is correct is that this woman had disseminated varicella.*" (Emphases added.)

¶ 51    In describing the rash in terms of the specific disease that is at issue in this case, the testimony not only implied that it *was* chicken pox, it was transmuted by counsel into a diagnosis of varicella zoster virus. The implicit suggestion that "if we, without any training in medical diagnosis, could see that this was chicken pox, Dr. Moran was clearly deficient when he could or did not" was made explicit when counsel asked Dr. Ortinau:

> "Q. He [Dr. Moran], *unlike the three lay people*, failed to recognize that *this was a chickenpox rash caused by disseminated varicella zoster virus*. Correct?
>
> [Defense counsel again objected, but was overruled.]
>
> A. Two lay people and a paramedic thought that this was a varicella zoster rash. That's correct." (Emphases added.)

We find that the testimony was without probative value and was inherently and unfairly prejudicial, that its prejudicial impact was enhanced by counsel's misuse of it with another witness, and that the court abused its discretion in both admitting the testimony and allowing its mischaracterization over objection.

¶ 52                    2. Barring of evidence of later treatment

¶ 53    Dr. Moran also asserts that the trial court erred in barring evidence, by both direct testimony and through cross-examination of plaintiff's experts, of Michelle's later treatment at Riverside Hospital.

¶ 54 From February 9, when Michelle was first seen at Riverside and transported to CINN, to February 21, when she died while being airlifted to Northwestern Memorial Hospital, twelve days elapsed. During that brief time she was examined at CINN by neurological specialists and diagnosed tentatively with *either* multiple sclerosis *or* lupus, and was released on large doses of prednisone. Five days later, she presented at St. Mary's Hospital complaining of severe back pain which made it difficult to walk and which she suggested might be a result of a lumbar puncture done in connection with her treatment at CINN. She made no complaint related to the rash that Dr. Moran noted on her upper body. Tests ordered by Dr. Moran showed her white blood cell count and liver enzymes were somewhat elevated. He attempted, without success, to consult with her personal physician (see *supra* ¶ 8), but did assertedly succeed in discussing her case with the neurological surgeon at CINN, who informed him of her treatment plan and, among other things, that final results of Michelle's tests were still not available.

¶ 55 Plaintiff's experts testified Dr. Moran breached the standard of care by (1) failing to recognize Michelle was immunosuppressed, (2) failing to diagnose Michelle's rash as chicken pox, (3) failing to diagnose an extremely rare variant of chicken pox–disseminated varicella zoster infection, and (4) failing to call in the appropriate experts for consultation.

¶ 56 In assessing whether Dr. Moran committed medical malpractice, it was the function of the jury, as the trier of fact, to determine whether the plaintiff had proven all of the following elements: (1) the proper standard of care against which the defendant physician's conduct is measured; (2) an unskilled or negligent failure to comply with that standard; and (3) a resulting injury proximately caused by the physician's want of skill or care. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 112 (2004).

¶ 57 Dr. Moran's challenge to the exclusion of evidence of Michelle's treatment on days two and three of her illness (February 20 and 21) is stated as:

"Whether the trial court erred in barring evidence of decedent's subsequent treatment when such evidence is relevant and material to: the liability issue as to whether defendant's [*sic*] diagnosed disseminated varicella virus and *pivotal to that issue is what decedent's rash looked like; what material experts relied on; and proof that the decedent lived several days after discharge from defendant emergency room."* (Emphasis added.)

Because the question is not expressly limited to the determination of the proper standard of care, but rather appears to sweep more broadly to cover breach of the standard of care and proximate cause, we consider all three elements of the malpractice claim.

¶ 58                                           a. Proper standard of care

¶ 59 Generally, the standard of care applicable to Dr. Moran is whether he, as an emergency room physician, used the skill, knowledge, and care appropriate to a reasonably careful emergency room physician to treat Michelle Koenig at St. Mary's Hospital on February 19, 2006. See generally *Studt v. Sherman Health Systems*, 2011 IL 108182, ¶¶ 33, 34; *Loman v. Freeman*, 229 Ill. 2d 104, 119 (2008); *Advincula v. United Blood Services*, 176 Ill. 2d 1, 23 (1996). The medical experts–armed with knowledge of Michelle's death, an autopsy report finding disseminated varicella zoster virus to be her cause of death, and having been

informed of her test results and that she had a raised vesicular rash–opined that the standard required, more specifically, that Dr. Moran diagnose Michelle as immunosuppressed, her rash as chicken pox, and her underlying condition as disseminated varicella zoster virus requiring the administration of acyclovir. Defining the standard of care is generally entrusted to medical professionals and it is, by definition, restricted to the time the defendant doctor was responsible for the patient's care. While expert opinion is extremely useful in defining the standard of care, it remains the duty of the jury to consider all of the opinions and make the final determination. *Borowski v. Von Solbrig*, 60 Ill. 2d 418, 423 (1975).

¶ 60                        b. Breach of the standard of care

¶ 61    The determination of whether a doctor acted in compliance with the applicable standard of care is limited, by definition, to the circumstances with which he was confronted at the time the medical service was rendered. Thus, the focus of the inquiry is what Dr. Moran did while Michelle was in his care based on what he knew, should have known, or was reasonably able to determine while Michelle was in his care. One of the questions to be addressed in response to the inquiry is whether he should have known that the rash was chicken pox. Some evidence of the answer to that question is the testimony of the experts, including Dr. Zar, who testified that the rash could *only* have been chicken pox.

¶ 62    None of the experts had actually seen the rash on Michelle, however. Dr. Moran was the only medically trained person to see it and he did not diagnose it as chicken pox. As previously discussed (*supra* ¶ 27), plaintiff attempted to exploit this lack of exactly contemporaneous corroboration by presenting the lay witnesses's conclusions that on the very day of Dr. Moran's treatment the rash "looked like chicken pox."

¶ 63    The evidence of the subsequent appearance of the rash that Dr. Moran sought to present, while clearly not speaking to exactly how the rash looked on February 19, was nonetheless instructive on how the rash looked and whether it ever looked like chicken pox. It was, therefore, legally relevant and potentially admissible. See *People v. Kirchner*, 194 Ill. 2d 502 (2000). Evidence is relevant if it has a tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than without the evidence. *Ford v. Grizzle*, 398 Ill. App. 3d 639, 646 (2010).

¶ 64    Whether Dr. Moran breached his standard of care by failing to recognize the rash as chicken pox is certainly a fact of consequence to the determination of the action. The jury should be able to consider all relevant evidence in resolving that issue. Experts opined from the advantage of hindsight that Moran should have recognized the rash; the autopsy report had conclusively determined that Michelle had chicken pox. The excluded evidence represents a nearly contemporaneous presentation of the rash with the same failure of doctors, including specialists plaintiff's experts would presumably find appropriate, to recognize chicken pox and the underlying disseminated varicella zoster infection and the same failure to provide treatment with acyclovir. The reasons for the failure of other *doctors* to diagnose chicken pox and underlying varicella zoster infection so close in time to Dr. Moran's treatment of Michelle is relevant and probative. Assigning the relative weight to be given to the experts and the on-the-scene doctors is within the proper province of the jury.

¶ 65     For these reasons we find that the trial court erred in excluding, as irrelevant to the standard of care, evidence of what other doctors saw and concluded on February 20 and 21.

¶ 66                                   c. Proximate cause

¶ 67     When the jury, on remand, ascertains the correct standard of care and whether or not Dr. Moran did, in fact, breach that standard, it must also determine whether any such breach was the proximate cause of Michelle's death. We do not see how that particular element of the inquiry can be addressed and resolved without evidence of the course of her disease and treatment between the time she came into Dr. Moran's care and the time she died. Our belief in the relevance of this evidence gains some support from the fact that the experts tendered by both parties found it helpful, and perhaps necessary, to review the records and testimony of Michelle's symptoms and treatment on those two days to arrive at salient conclusions of their own.

¶ 68     In barring this evidence altogether, we find the trial court deprived the jury of information relevant to its determination of whether any breach of his standard of care by Dr. Moran was a proximate cause of Michelle's death. We find the trial court abused its discretion in this regard resulting in reversible error entitling Dr. Moran to a new trial.

¶ 69          3. Allowing an infectious disease specialist to address standard of care

¶ 70     Dr. Moran next challenges the trial court's decision to allow Dr. Zar, a doctor specializing in internal medicine and infectious disease, to testify on the standard of care of an emergency room physician.

¶ 71     In *Sullivan v. Edward Hospital*, 209 Ill. 2d 100 (2004), the supreme court reviewed its earlier decisions on who may provide expert medical testimony on the standard of care. The court noted that in *Purtill v. Hess*, 111 Ill. 2d 229 (1986), it had established two foundational requirements that must be met to demonstrate an expert physician's qualifications and competency to testify. First, the physician must be a licensed member of the school of medicine about which he proposes to testify. Second the expert witness must show that he is familiar with the methods, procedures, and treatments ordinarily observed by other physicians in either the defendant physician's community or a similar community. *Purtill*, 111 Ill. 2d at 242-43. If the expert physician fails to satisfy either of these foundational requirements, "the trial court must disallow the expert's testimony." *Jones v. O'Young*, 154 Ill. 2d 39, 44 (1992). Once these foundational requirements have been met, the trial court has the discretion to determine whether a physician is qualified and competent to state his opinion as an expert regarding the standard of care. *Purtill*, 111 Ill. 2d at 243.

¶ 72     The evidence in this case disclosed that both Dr. Moran and Dr. Zar were licensed to practice medicine and surgery, thus satisfying the first requirement. Further, Dr. Zar testified that he took his residents to the emergency room as part of a combined residency program to train doctors in internal medicine and emergency medicine, and that he works with emergency room physicians on a regular basis. He thereby established his familiarity with emergency room practice and satisfied the second requirement.

¶ 73    Whether he was otherwise qualified to testify as an expert on the standard of care of an emergency room physician was left to the trial court's sound discretion. We review its decision in that regard for an abuse of discretion.

¶ 74    We can fully understand Dr. Moran's concerns, first, that a specialist in infectious disease would likely be better equipped to recognize a rare infectious disease than a doctor who, by the nature and necessities of his job, is more of a generalist, and, second, that a higher or more exacting standard of care might be imposed upon him by such a specialist. While another judge might have weighed this risk differently than did the trial court in this case, we note that "[w]hether the expert is qualified to testify is not dependent on whether he is a member of the same speciality or subspecialty as the defendant but, rather, whether the allegations of negligence concern matters within his knowledge and observation." *Jones*, 154 Ill. 2d at 43. Because of Dr. Zar's qualifications in internal medicine and his experience with emergency room physicians and residents, he could offer competent, relevant and helpful testimony on the matter of Michelle presenting in the St. Mary's emergency room with a form of chicken pox. Consequently, we cannot say that no reasonable person would take the view of the trial court and thus we find that its decision was not an abuse of discretion. A reasonable person could also conclude that Dr. Zar's limited experience in emergency rooms goes to the weight rather than the admissibility of his opinions.

¶ 75                    4. Plaintiff's use of two standard of care experts

¶ 76    Dr. Moran next contends that the trial court erred when it denied his motion to bar Mulliken's testimony as cumulative. Steele answers that the number of expert witness to testify for each party is a matter of the trial court's discretion, and in this case, the court did not abuse its discretion. We agree.

¶ 77    A trial court has discretion to exclude cumulative evidence, and a ruling in this regard will not be reversed unless the trial court abuses its discretion. *Kozasa v. Guardian Electric Manufacturing Co.*, 99 Ill. App. 3d 669, 678 (1981). Within this discretion is a trial court's ability to limit the number of expert witnesses a party may present. *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 494-96 (2002).

¶ 78    Here, the record does not indicate that the trial court abused its discretion when it permitted Steele to present expert testimony by both Drs. Zar and Mulliken. As Steele notes, Dr. Zar specialized in internal medicine and infectious diseases and had relevant emergency room experience, and Dr. Mulliken specialized in emergency care. This case centered on emergency treatment for a patient who had a variation of the chicken pox virus; thus, it was relevant to Steele's case to present expert testimony from a witness who had emergency room experience and specialized in infectious diseases and another who specialized in emergency care. The testimony of Drs. Zar and Mulliken was not necessarily cumulative, and the trial court did not abuse its discretion when it denied Dr. Moran's motion to bar Dr. Mulliken's testimony.

¶ 79　　　　　　　　　B. Evidentiary Issues Relevant to Wrongful Death Action

¶ 80　　　　　　　　　　　1. General law about wrongful death

¶ 81　　　The first section of the Wrongful Death Act recognizes, in pertinent part, that:

> "Whenever the death of a person shall be caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who or company or corporation which would have been liable if death had not ensued, shall be liable to an action for damages ***." 740 ILCS 180/1 (West 2012).

This section requires Steele to prove that Michelle would have prevailed in an action for negligent medical treatment asserted against Dr. Moran.

¶ 82　　　The scope of the pecuniary injuries and the potential beneficiaries of damages are defined in the pertinent part of section 2:

> "Every such action shall be brought by and in the names of the personal representatives of such deceased person, and *** the amount recovered in every such action shall be for the exclusive benefit of the surviving spouse and next of kin of such deceased person. In every such action the jury may give such damages as they shall deem a fair and just compensation with reference to the pecuniary injuries resulting from such death, including damages for grief, sorrow, and mental suffering, to the surviving spouse and next of kin of such deceased person." 740 ILCS 180/2 (West 2012).

See also *Elliot v. Willis*, 92 Ill. 2d 530, 540 (1982). In the instant case, Michelle left no spouse or children and the potential beneficiaries of the wrongful death action were her mother, Rita Steele; her father, Todd Koenig; and her half-sister, Jessica Watts.

¶ 83　　　　　　　　　　　2. Wrongful death issues raised on appeal

¶ 84　　　Dr. Moran argues that the trial court erred in: (1) refusing to allow evidence or instruction about plaintiff's health and the effects on her quality of life since she had multiple sclerosis (issue 5); (2) barring defendants from eliciting testimony that the decedent's mother gave up parental rights for four years when the sole issue of damages is loss of society (issue 7); and (3) permitting unfounded hearsay conversations between the decedent and her father about her alleged plans to go to community college when there was no lost wage claim (issue 8).

¶ 85　　　First, on the issue of Michelle's health, Dr. Moran asserts that the trial court erred when it did not allow testimony from physicians who treated Michelle at the Chicago Institute concerning the diminished quality of life of a person with multiple sclerosis, and also erred when it did not instruct the jury to consider Michelle's health in its determination of damages. Steele argues that Dr. Moran did not disclose an opinion concerning Michelle's alleged diminished quality of life or life expectancy during discovery, and in the absence of such evidence, the court did not abuse its discretion.

¶ 86　　　The trial court has wide discretion in the admission or exclusion of evidence. *Martin v. Sally*, 341 Ill. App. 3d 308, 314 (2003). Here, the trial court did not abuse its discretion when it refused to permit Dr. Moran to present testimony about Michelle's alleged diminished

quality of life or life expectancy. The record does not indicate that any such testimony was disclosed prior to trial, either through discovery submissions or deposition testimony, and thus, the trial court cannot be found to have abused its discretion in excluding the medical opinion evidence. Nor is there any indication in the record that Dr. Moran made an offer of proof as to the contents of this evidence or what it would establish. See *McMahon v. Coronet Insurance Co.*, 6 Ill. App. 3d 704, 711-12 (1972) (appellate court concluded that a party may not raise an issue concerning the trial court's exclusion of certain expert testimony because the party did not make an offer of proof showing the actual substance of the testimony). We find that Dr. Moran has therefore forfeited this issue.

¶ 87    For the same reasons, the trial court did not err in refusing to instruct the jury to consider Michelle's health in assessing damages.

¶ 88    Second, regarding Steele's alleged relinquishment of her parental rights to Michelle, our review of the record reveals no factual or legal basis for any contention that she or a court took action depriving her of parental rights. See 750 ILCS 50/8 (West 2006). There is evidence in the record that Steele and Todd agreed Michelle should reside in Florida with her father to avoid her continued association with the "wrong crowd of kids." We note Michelle lived five years after the end of the separation and was apparently living with her mother at the time of her death. The decision of what to do with this contradictory proffered testimony rests in the discretion of the trial court and we cannot say, on this record, that allowing the warring contentions to go to the jury–the finder of fact–was an abuse of discretion.

¶ 89    Third, turning to Dr. Moran's complaint concerning any discussions of Michelle's intent to enroll in community college, we again find no error on the part of the trial court. Steele contends that this testimony was only relevant to Michelle's relationship with her mother and father and to an understanding of Michelle's life at the time of her death. The testimony indicated that Michelle had personal aspirations and that she shared her goals and dreams with her parents. We note that plaintiff did not seek lost wages or any other damages related to participation in or completion of any degree granting program. Nor did either party present evidence that Michelle applied to or had been accepted by any postsecondary institution. We find no evidence in the record that the testimony was offered for or relevant to anything other than Michelle's relationship with her parents, and therefore, its admission was not an abuse of discretion.

¶ 90                    C. Evidentiary Issues Related to Discovery

¶ 91    Dr. Moran raises the following specific issues pertaining to alleged violations of Illinois Supreme Court Rule 213 (eff. Jan. 1, 2007): (1) whether the trial court erred in barring defendant from testifying that the decedent's liver enzymes were high since such testimony is a logical corollary to defendant's disclosed opinion that he would testify as to his findings (issue 6); (2) whether the trial court erred in allowing undisclosed expert testimony as to why the alleged chicken pox did not itch (issue 9); and (3) whether the trial court erred in allowing plaintiff to improperly question defendant's proximate cause expert about standard of care opinions outside the scope of direct examination and Rule 213 disclosures (issue 10).

¶ 92    "The purpose of discovery rules, governing the 'timely disclosure of expert witnesses,

-15-

their opinions, and the bases for those opinions[,] is to avoid surprise and to discourage strategic gamesmanship.' " *Spaetzel v. Dillon*, 393 Ill. App. 3d 806, 812 (2009) (quoting *Thomas v. Johnson Controls, Inc.*, 344 Ill. App. 3d 1026, 1032 (2003)). Rule 213 disclosure requirements are mandatory and command strict compliance from the parties. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109 (2004).

¶ 93 Faced with a challenge that testimony was not disclosed or exceeds the scope of Rule 213 disclosure, a trial court's ruling on the admission of evidence is an exercise of its discretion and will not be reversed absent an abuse of that discretion. *Sullivan*, 209 Ill. 2d at 109. An abuse of discretion occurs when no reasonable person would take the view of the trial court. *Foley v. Fletcher*, 361 Ill. App. 3d 39, 46 (2005).

¶ 94 The current version of Rule 213 (Ill. S. Ct. R. 213 (eff. Jan. 1, 2007)) creates three classes of opinion witnesses; lay witnesses are only required, in Rule 213(f)(1), to disclose the subject of the their testimony rather than the detailed disclosure previously compelled by section Rule 213(g). The Committee Comments of March 28, 2002, explain that "applying this detailed-disclosure requirement to lay witnesses creates a serious burden without corresponding benefit to the opposing party."[3] Ill. S. Ct. R. 213, Committee Comments (Mar. 28, 2002).

¶ 95 Independent expert witnesses have intermediate disclosure obligations set out in Rule 213(f)(2). None of the witnesses in the instant case fall into this category.

¶ 96 Because the third class of witnesses, the controlled experts described in Rule 213(f)(3), can be counted on for full cooperation, "the amended rule requires the party to provide all of the details required by the former rule." *Id.* Thus, "the requirement that the party identify the 'subject matter' of the testimony means that the party must set forth the gist of the testimony on each topic the witness will address, as opposed to setting forth the topics alone." *Id.* The controlled expert witnesses include Drs. Moran, Zar, Mulliken, Ortinau and Segreti. We consider Dr. Moran's discovery challenges in the context of this very brief overview of the disclosure requirements.

¶ 97 First, Dr. Moran contends that the trial court erred in granting Steele's motion *in limine* barring him from testifying as to why Michelle's liver enzymes were high because such testimony was part of his findings during his care and treatment of Michelle. Steele asserts that the court properly barred this testimony because Dr. Moran did not disclose his reason as to why Michelle's liver enzymes were high prior to trial.

¶ 98 An expert's opinion testimony at trial is limited to "[t]he information disclosed in answer to a Rule 213(f) interrogatory, or in a discovery deposition." Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2007). While a witness may elaborate on his disclosed opinion as long as it is a logical corollary to the opinion, and not a new reason for it, "[t]he testimony at trial must be encompassed by the original opinion." *Foley*, 361 Ill. App. 3d at 47 (court affirmed trial court's determination to permit expert testimony concerning the standard of care during childbirth because the expert witness' disclosure referred to the prenatal period in general,

---

[3]Given this change, the disclosures of Rita Steele related to agency that are challenged by Provena were compliant with the amended rule.

and not only the time before labor).

¶ 99      Here, the record indicates that during Dr. Moran's deposition, he stated that he did not have an opinion as to why Michelle's liver enzymes were elevated on February 19. Likewise, at trial Dr. Moran testified that he had no opinion on the day he treated her as to the cause of Michelle's elevated liver enzymes. If he developed such an opinion after submitting his Rule 213 disclosures and giving his deposition, and prior to trial, he had a duty under Rule 213(i) to supplement his answers. We find no evidence in the record that he did so. Overall, this testimony cannot be a natural corollary of any disclosed opinion when he twice expressly denied having such an opinion. The trial court did not abuse its discretion in granting Steele's motion *in limine* barring this testimony.

¶ 100     Dr. Moran next contends that the trial court abused its discretion when it permitted Steele to cross-examine Dr. Segreti concerning the standard of care of an emergency room physician because he was only offered and qualified as an expert on proximate cause and his Rule 213 disclosures were limited to causation. On direct examination, Dr. Segreti was only asked for causation opinions. Steele counters that Dr. Segreti explicitly testified on cross-examination that he had no opinion as to the standard of care of an emergency room physician.

¶ 101     Initially we note that the issue as framed objects to the questions being allowed, not to the answers that were or were not given. That Dr. Segreti denied having an opinion on the standard of care is not responsive to the challenge on appeal.

¶ 102     This issue calls into question the parameters of Rule 213(g), which provides relative to Rule 213(f) opinion witnesses, in pertinent part:

>     "g. Limitation on Testimony and Freedom to Cross-Examine. ***
>
>     Without making disclosure under this rule, however, a cross examining party can elicit information, including opinions, from the witness." Ill. S. Ct. R. 213(g) (eff. Jan. 1, 2007).

The meaning of the quoted sentence has been liberally interpreted. *Stapleton v. Moore*, 403 Ill. App. 3d 147, 160 (2010) (Rule 213 specifically allows the eliciting of even new, previously undisclosed opinions on cross-examination.); *Jackson v. Reid*, 402 Ill. App. 3d 215, 234 (2010) (the scope of disclosure required by Rule 213(f)(3) does not limit or restrict the scope of cross-examination when testing the expert's opinion testimony); *Skubak v. Lutheran General Health Care Systems*, 339 Ill. App. 3d 30, 32 (2003) (Rule 213's disclosure requirements do not apply to cross-examination of an opposing party's opinion witness); *Maffett v. Bliss*, 329 Ill. App. 3d 562, 577 (2002) (none of Rule 213's disclosure requirements applies to cross-examining an opposing party's opinion witness). However, we have been unable to find a case that presents the situation with which we are confronted. We find, for the following reasons, that Rule 213(g) does not authorize the cross-examination challenged here.

¶ 103     As we have previously discussed in paragraph 72, standard of care opinions can only be rendered by doctors who meet two foundational requirements. Because Dr. Segreti is licensed in the same school of medicine as Dr. Moran, he clearly satisfies the first; there was, however, no showing that he was sufficiently knowledgeable of emergency room procedures

to satisfy the second. Absent such qualifications, it was improper, even considering Rule 213(g), to allow him to be questioned on the standard of care.

¶ 104　Moreover, seeking standard of care opinions from Dr. Segreti plainly exceeded the scope of direct examination and was not a logical expansion of any questions he had been asked or answers he had given. We do not believe that the rule is intended to change fundamental and long-standing procedural, as opposed to disclosure, restrictions on cross-examination.

¶ 105　Finally, the purpose of the discovery rules is to avoid surprise and to discourage strategic gamesmanship. *Thomas v. Johnson Controls, Inc.*, 344 Ill. App. 3d 1026, 1032 (2003). Plaintiff's attorney admitted that the goal of his cross-examination of Dr. Segreti was just that, saying in his brief:

> "Plaintiff's counsel intended to suggest that Segreti conveniently had no such opinions not because he could not offer standard of care opinions about emergency room doctors, but rather because they would have cut against Dr. Moran's position. [Citation.] After a lengthy argument [citation], counsel asked Segreti whether he had offered standard of care opinions in similar cases, but he could not recall."

It is this use of improper questioning to negatively influence the jury that Dr. Moran contends was error. The trial court erred in allowing this cross-examination over objection.

¶ 106　Finally, Dr. Moran contends that the trial court erred when it permitted Dr. Zar to testify that Michelle's chicken pox did not itch because he had not presented this testimony in his Rule 213 disclosures or in his deposition. Steele contends that the topic of prednisone was explored during Dr. Zar's deposition, and thus, his testimony that its ingestion was the reason why the rash did not itch should not have taken them by surprise. We do not believe that this rationale is consistent with the disclosure requirements of Rule 213(f)(3) that we have previously discussed.

¶ 107　However, Steele also asserts that any error was harmless because Dr. Moran had already recognized in his testimony that prednisone may suppress itching. Where testimony is undisclosed pursuant to Rule 213, but is cumulative of other testimony, the opposing party is not prejudiced by its admission and a new trial is not warranted. *Bauer v. Memorial Hospital*, 377 Ill. App. 3d 895, 914 (2007). In this case, even if the court erred in permitting Dr. Zar to testify that Michelle's chicken pox did not itch because of her use of prednisone, the error was of no consequence.

¶ 108　　　　　D. Disallowance of Dr. Moran's Sole Proximate Cause Defense

¶ 109　Dr. Moran contends that the trial court erred when it granted Steele's motion *in limine* preventing him from presenting evidence that Michelle's subsequent treatment at Riverside was the sole proximate cause of her death. Because we have ruled on the admissibility of evidence of subsequent treatment at Riverside Hospital and have remanded for a new trial, we decline to further address this issue.

¶ 110　We also decline to address, because of the decision to grant a new trial, alleged errors in the jury instructions, cumulative errors, denial of the motions for directed verdict, manifest weight of the evidence, and *remittitur* of the damages award.

¶ 111                   II. Appeal of Provena Hospitals, No. 3-11-0374

¶ 112      When Michelle and her mother arrived at St. Mary's Hospital on February 19, Michelle
was given a consent form for her signature. Steele took the form, printed Michelle's name
and then instructed her to sign it. Michelle signed the consent and it was witnessed on behalf
of the hospital.

¶ 113      The form provides in pertinent part:

**"Consent to and Conditions for Treatment**

**The terms and conditions that apply to the care, treatment, and other services
provided by or through Provena Health, or at any of Provena Health's facilities, are
set forth below. Please read these terms and conditions very carefully.**

**CONSENT TO TREATMENT**

\* \* \*

I understand that the practice of medicine is not an exact science. I acknowledge that
no guarantees have been made, or can be made, regarding any care, treatment, or other
related services that may be provided by or through Provena Health, or at any of Provena
Health's facilities. *I acknowledge and understand that most physicians who provide
physician services at Provena Health are not employees or agents of Provena Health,
but instead are independent medical practitioners and independent contractors. I
understand that each of these medical practitioners exercises his or her own,
independent medical judgment and is solely responsible for the care, treatment, and
services that they order, request, direct, or provide. I acknowledge that these
practitioners are not subject to the supervision or control of Provena Health and that the
employment or agency status of physicians who treat me is not relevant to my selection
of Provena Health for my care.* I also understand that I will receive, and am solely
responsible for payment of, a separate bill from each of these independent practitioners,
or groups of practitioners, for care, treatment, or services provided.

\* \* \*

ACCEPTANCE AND SIGNATURE

I represent that I, as either the person identified above or such person's legal
representative, have read and understand, and am duly authorized to accept and execute,
these terms and conditions. Any questions that I've had have been satisfactorily
answered. I hereby accept and agree to be bound by all of the above terms and conditions
and I agree that a copy of this document may be used in the place of the original in
enforcing any rights hereunder." (Emphasis added.)

The document is signed by Michelle Koenig, witnessed by Josephine Johnson and dated.
There are two lines below the signatures for a representative to explain why the patient is
unable to sign. Nothing was written on those lines.

¶ 114      There is no evidence that either Michelle or her mother read the consent form, asked any
questions or had knowledge of its contents. Indeed, Steele affirmatively asserted that neither
she nor Michelle read the consent and, because they did not, it was not binding on them.

-19-

Provena responds that long-standing Illinois law clearly holds that a competent adult who signs a document is deemed to have read it and is bound by its terms. Provena also argues that the consent form on its face defeats two elements–holding out and reliance–of the three plaintiff must prove to establish the apparent agency of Dr. Moran.

¶ 115    In order to hold a hospital vicariously liable for the acts of an independent contractor, the plaintiff must plead and prove that he or she acted as the hospital's apparent agent. *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 183 (2006). The supreme court has stated:

"[U]nder the doctrine of apparent authority, a hospital can be held vicariously liable for the negligent acts of a physician providing care at the hospital, regardless of whether the physician is an independent contractor, unless the patient knows, or should have known, that the physician is an independent contractor. The elements of the action [are] as follows:

'For a hospital to be liable under the doctrine of apparent authority, a plaintiff must show that: (1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence.' [Citation.]" *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 524-25 (1993).

¶ 116    The supreme court explained that when a patient is unaware that the treatment provider is not an employee or agent of the hospital, the patient should still have the right to look to the hospital for financial recovery in an instance involving negligent emergency room care. Thus, " '[t]he fact that, unbeknownst to the patient, the physician was an independent contractor should not prohibit a patient from seeking compensation from the hospital which offers the emergency room care.' " *Gilbert*, 156 Ill. 2d at 522 (quoting *Pamperin v. Trinity Memorial Hospital*, 423 N.W.2d 848, 855 (Wis. 1988)).

¶ 117    In *York*, the supreme court emphasized the complexity of the issues presented in a case such as this one, stating:

"In *Gilbert*, this court recognized that the relationship between a patient and health-care providers, both physicians and hospitals, presents a matrix of unique interactions that finds no ready parallel to other relationships." *York*, 222 Ill. 2d at 192.

Because of the variety of these relationships and the efforts of the players to either limit their exposure to liability or maximize their potential for recovery from the most or the deepest pockets, a determination of whether the doctrine of apparent agency renders a hospital vicariously liable for the malpractice of an independent contractor appears to demand a fact-specific inquiry.

¶ 118    In the instant case, Provena argues that the consent form signed by Michelle is dispositive of this appeal because it provides legally binding evidence that (1) Michelle was on notice that it was likely Dr. Moran was an independent contractor and not an employee of the hospital ("most physicians *** are not employees"), thereby defeating the element of

-20-

"holding out," and (2) it was of no consequence to her whether any doctors who treated her were employees of the hospital or independent contractors, thereby defeating the element of reliance. Provena contends that the consent form requires judgment in its favor and asks us to find that the trial court erred in denying its motion for judgment notwithstanding the verdict (judgment *n.o.v.*) and denying it a new trial.

¶ 119    In addressing those issues, we consider whether Michelle's failure to read the consent form that she signed avoids its legal effect; whether the court erred in finding Steele's reliance rather than Michelle's was controlling, and in allowing her attorney to make such an argument in closing, and/or in so instructing the jury; and whether the consent form defeats one or more elements of apparent authority.

¶ 120                    A. Failure to Read the Consent Form

¶ 121    We look first at whether Michelle's signature on the consent form binds her to knowledge of its contents even though she did not read it. Illinois law on this question is long-standing and consistent. The supreme court held in *Black v. Wabash, St. Louis & Pacific Ry. Co.*, 111 Ill. 351, 358 (1884), that a competent adult is charged with knowledge of and assent to a document the adult signs and that ignorance of its contents does not avoid its effect. That principle has been consistently reiterated by the supreme court and by the appellate court. See, for example, recent decisions in *Melena v. Anheuser-Busch, Inc.*, 219 Ill. 2d 135, 150 (2006); *All American Roofing, Inc. v. Zurich American Insurance Co.*, 404 Ill. App. 3d 438, 447-49 (2010). Thus, the terms of Provena's consent form and Michelle's assent to them are not negated by her failure to read the document.

¶ 122                    B. Legal Effect of the Executed Consent Form
¶ 123                        1. Rita Steele's observations and reliance

¶ 124    We next consider whether there is evidence in the record to support the trial court's finding that it is Rita Steele's observations and reliance that are controlling, rather than Michelle's assent to the terms of the consent form. We find none.

¶ 125    Michelle was 20 years old and, therefore, an adult when she arrived at St. Mary's on February 19. She was conscious upon arrival at the hospital and was able to sign the consent form when directed by her mother to do so. There was no evidence she had been unconscious in the ambulance. Although she was in pain, she was able to discuss her symptoms and medical history and to opine that the pain might be the result of an earlier lumbar puncture. After receiving medication, she was able to walk around and use the bathroom. We find no evidence from which to conclude that she was unable to understand or assent to the terms in the consent form.

¶ 126    Steele did not sign the consent form for Michelle or indicate in the space provided on the form that Michelle was unable to consent or that there was any reason why Michelle could not sign it. Moreover, Steele provided no power of attorney or other legal instrument to establish herself as Michelle's legal representative or assert any other legally cognizable basis for recognizing her right to act or otherwise stand in her daughter's stead.

¶ 127    We find Steele's claim that *Monti v. Silver Cross Hospital*, 262 Ill. App. 3d 503 (1994), and *Nosbaum v. Martini*, 312 Ill. App. 3d 108 (2000), validate the substitution of her actual or constructive knowledge for Michelle's consent to lack merit. In *Monti*, the patient was unconscious and unable to act for herself but proved that others responsible for her care, including her husband, relied on the hospital to provide complete emergency care for her. *Monti*, 262 Ill. App. 3d at 507-08. In *Nosbaum*, the patient was a child and the choice was made by her biological father. *Nosbaum*, 312 Ill. App. 3d at 122. Here, Michelle was a conscious and lucid adult and was not acting at the direction of any person with authority to act or decide on her behalf.

¶ 128    *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147 (2006), on which plaintiff also relies, is factually inapposite. Plaintiff, Dr. James York, was alive and he testified that he relied on his son, Dr. Jeff York, to select the anesthesiologist for his surgery. In addition, the consent form signed by the *York* plaintiff was vastly different from that signed by Michelle Koenig, in that "the treatment consent form nowhere stated that plaintiff would be treated by independent-contractor physicians." *York*, 222 Ill. 2d at 197. The court went on to quote excerpts from the consent that could "reasonably be interpreted as allowing Rush to select anesthesiologists." (Internal quotation marks omitted.) *York*, 222 Ill. 2d at 197.

¶ 129    Because we find no legal basis for supplanting Michelle's acknowledgments and understandings with Steele's beliefs, we hold that the trial court erred in its contrary finding and in permitting plaintiff's counsel to argue to the jury that the consent form could be disregarded and in instructing the jury that plaintiff only had to prove what Steele, and not Michelle, knew or should have known about Moran's relationship with the hospital.

¶ 130    2. Binding nature of the consent form Michelle signed

¶ 131    There is no evidence in the record showing that Michelle made any observations or statements relative to Dr. Moran's relationship with Provena while at St. Mary's. Nor, because of her death, could she provide such evidence on retrial. We therefore find that the executed consent form is the sole legally cognizable determinant in this case of whether plaintiff has proven apparent authority so as to render Provena vicariously liable for Moran's alleged medical negligence. This court has held that such consents are "almost conclusive" in determining whether a hospital should be held liable for the medical negligence of an independent contractor. *Thede v. Kapsas*, 386 Ill. App. 3d 396, 401 (2008). The foregoing findings are sufficient to entitle Provena to a new trial.

¶ 132    3. Judgment notwithstanding the verdict

¶ 133    But Provena also seeks a judgment *n.o.v.*, claiming that the consent form signed by Michelle conclusively establishes (1) that Provena did not hold out Dr. Moran as its apparent agent and (2) that Michelle either knew there was no employee relationship between Provena and Dr. Moran or it did not matter to her whether such a relationship existed, thereby disclaiming any reliance on Provena to provide her care.

¶ 134    A trial court should grant a motion for judgment notwithstanding the verdict only in those limited cases where all of the evidence and the inferences from the evidence, when viewed

in the light most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Maple v. Gustafson*, 151 Ill. 2d 445 (1992). We review a trial court's determination on a motion for judgment *n.o.v. de novo*. *Thornton v. Garcini*, 382 Ill. App. 3d 813 (2008). In undertaking its *de novo* review, an appellate court "has no right to enter a judgment *n.o.v.* if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Maple*, 151 Ill. 2d at 454.

¶ 135    The elements necessary to prove apparent agency in a medical malpractice action as defined in *Gilbert* have been set out in paragraph 116.

¶ 136    Provena does not contest whether Steele met the second apparent authority factor. Therefore we consider only whether, when we view the evidence in the light most favorable to Steele, it shows that she satisfied the first ("holding out") and third (reliance) elements of her apparent agency claim.

¶ 137                          a. "Holding out" of Dr. Moran as an employee

¶ 138    Regarding "holding out," if a patient has actual or constructive knowledge that the doctor is an independent contractor, the hospital is not vicariously liable. The hospital prevails on this element if "the patient is in some manner put on notice of the independent status of the professionals with whom he might be expected to come into contact." (Internal quotation marks omitted.) *York*, 222 Ill. 2d at 182. The consent form Michelle signed advised that " 'most physicians who provide physician services at Provena Health are not employees or agents of Provena Health, but instead are independent medical practitioners and independent contractors.' " (Emphasis omitted.) *Supra* ¶ 113. Unlike the situation in *Churkey v. Rustia*, 329 Ill. App. 3d 239 (2002), where the form also did not say that *all* of the providers were independent contractors, the *Churkey* consent did link the independent providers with practice areas. *Churkey*, 329 Ill. App. 3d at 244. Provena's consent did not.

¶ 139    We acknowledge Provena's argument that *York*'s phrase "in some manner put on notice of the independent status of the professionals *with whom she might be expected to come into contact*" (emphasis added and internal quotation marks omitted) (*York*, 222 Ill. 2d at 182) suggests some flexibility in the test. However, given the very high standard for entry of a judgment *n.o.v.*, we find that the consent does not convincingly put plaintiff on notice that *Dr. Moran* is an independent contractor and thereby adequately defeat the "holding out" factor.

¶ 140                          b. Reliance on employee relationship

¶ 141    Turning to the reliance factor, we find that the statement, "I acknowledge *** that the employment or agency status of physicians who treat me is not relevant to my selection of Provena Health for my care," in the consent form constitutes a clear disclaimer of Michelle's reliance on the hospital for her medical care. We believe that this statement gains still more weight when taken in conjunction with the additional acknowledgments that "most" of the providers are independent contractors who function and bill for their services independently

-23-

of the hospital, and that "any questions that I've had have been satisfactorily answered," constitute definitive indicators that Michelle was not relying on Provena or, vicariously, on the employee status of any of her treaters in seeking emergency care. We, therefore, find that plaintiff failed to sustain her burden of proving Michelle's reliance on Provena and that a judgment *n.o.v.* should have been granted by the trial court.

¶ 142                                                    CONCLUSION

¶ 143     For all of the foregoing reasons, the verdict in favor of plaintiff is reversed, judgment not withstanding the verdict is entered for Provena, and the matter is remanded for a new trial on plaintiff's claims against Dr. Moran.

¶ 144     No. 3-11-0374, judgment notwithstanding the verdict entered.

¶ 145     No. 3-11-0375, reversed and remanded.