# Illinois Official Reports

## Appellate Court

---

### *Mizyed v. Palos Community Hospital*, 2016 IL App (1st) 142790

---

| | |
|---|---|
| Appellate Court Caption | SALEH MIZYED, Plaintiff-Appellant, v. PALOS COMMUNITY HOSPITAL, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-14-2790 |
| Rule 23 order filed<br>Rule 23 order withdrawn<br>Opinion filed | March 28, 2016<br><br>May 2, 2016<br>May 9, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-L-1501; the Hon. John H. Ehrlich, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Muslin & Sandberg, of Chicago (Craig M. Sandberg, of counsel), for appellant.<br><br>Pretzel & Stouffer Chtrd., of Chicago (Robert Marc Chemers, Matthew J. Egan, Edward J. Aucoin, Jr., and Scott L. Howie, of counsel), for appellee. |
| Panel | PRESIDING JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.<br>Justices Connors and Harris[1] concurred in the judgment and opinion. |

---

[1]Pursuant to Justice Liu's passing, Justice Harris has reviewed the briefs, the Rule 23 order filed March 28, 2016, and the motion to publish filed in the above captioned case and is participating in the disposition.

OPINION

¶ 1     Plaintiff-appellant Saleh Mizyed appeals from the trial court's order granting summary judgment dismissing his medical malpractice complaint against the defendant-appellant Palos Community Hospital (Palos), which was premised on Palos' vicarious liability for the alleged negligence of Mizyed's treating physicians. For the reasons set forth below, we affirm.

¶ 2                                              BACKGROUND

¶ 3     This action arises out of treatment rendered to Mizyed at Palos in early 2009. Mizyed is a native Arabic speaker. He speaks a limited amount of English and was deposed in this case with the assistance of an interpreter. Mizyed testified that he cannot read or write in either English or Arabic and that he relies on his adult children to read and translate documents for him. His adult daughter, Nadera (who testified that she has no difficulty speaking or reading English), sometimes accompanied Mizyed to doctors' appointments.

¶ 4     On January 26, 2009, Mizyed visited his primary physician, Dr. Odeh, for a regularly scheduled appointment. Nadera accompanied him during that visit. At Dr. Odeh's office, a nurse administered an electrocardiogram (EKG) to monitor Mizyed's heart. Based on the EKG results, Dr. Odeh told Mizyed that he needed to go to a hospital immediately. According to Nadera, Dr. Odeh told Mizyed that "it looks like you're having a heart attack right now." Dr. Odeh called an ambulance, and Mizyed was transported to Palos.

¶ 5     Nadera and other relatives arrived at Palos' emergency room that evening. According to Nadera, emergency room doctors indicated they suspected that Mizyed had a "major blockage" that could require surgery. Nadera testified that none of the medical personnel at Palos spoke Arabic.

¶ 6     During his treatment at Palos, Mizyed was provided with a number of consent forms, which Palos later relied upon in seeking summary judgment. Mizyed's signature appears on five consent forms provided by Palos, all of which are in English. Although Mizyed did not specifically recall each form that he signed, he acknowledged that he signed certain forms based on Nadera's advice:

> "Q. *** What were you told about the forms before you signed them?
>
> A. I don't know. They were basically talking to Nadera, my daughter. They were showing her my heart on the monitor and telling her that I had four blocked arteries and they needed to do surgery.
>
> Q. Did Nadera look at the forms before you signed them?
>
> A. Of course they were talking to Nadera and to my wife.
>
> Q. And did Nadera explain or go over any of the forms with you before you signed them?
>
> A. Yes. She told me, 'Dad, sign the paper because they want to do surgery for you,' and I trust my daughter. So I signed the papers."

Mizyed additionally testified: "I don't speak English 100 percent, and I don't know what the doctors were telling me. I based everything upon what Nadera told me and based upon that I signed."

¶ 7      Two of the forms with Mizyed's signature are dated January 26, 2009, the date that he was first taken to Palos. First, Mizyed signed a form entitled "CONSENT FOR EMERGENCY TREATMENT," which consisted of four numbered paragraphs. The first paragraph, under the heading "AUTHORIZATION FOR EXAMINATION AND TREATMENT," states:

> "I wish to be treated in the Emergency Room and/or be admitted for treatment to Palos Community Hospital. I understand and acknowledge that in presenting myself for emergency treatment and/or voluntary inpatient admission, or outpatient treatment, I authorize and consent to the administration and performance of all tests and treatments which may be ordered by my physicians and the physicians in the Emergency Room and carried out by members of the Palos Community Hospital Medical Staff and/or personnel."

¶ 8      The second numbered paragraph, in bold type, states: "I understand that all physicians providing services to me, including emergency room physicians, radiologists, pathologists, anesthesiologists, my attending physician and all physician consultants, are independent medical staff physicians and not employees or agents of Palos Community Hospital." The third and fourth paragraphs consisted of a description of Palos' privacy practices, and an acknowledgment that payment of insurance benefits would be made "to the party who accepts assignment."

¶ 9      At his deposition, Mizyed acknowledged that this consent form contains his signature but he did not recall signing it. However, Nadera testified that she was present when her father signed this consent form. Although she had not read the whole document, she nonetheless encouraged him to sign:

> "Q. Were you *** physically present with your father when he signed this on January 26th of 2009?
>
> A. Yes.
>
> Q. Did he ask you any question about it, if you remember?
>
> A. Of course, I'm, like, this is just – I didn't read the whole thing but I'm, like, it's just to treat you. That's what I said to him. This is to treat you so they could go ahead and treat you.
>
> Q. So, he asked you a question about it before he signed it?
>
> A. Yes, uh-huh.
>
> Q. Yes?
>
> A. Yes.
>
> Q. And you told him after looking it over that it was okay for him to sign it?
>
> A. Yes.
>
> Q: So he could be treated?
>
> A. Yes."

Nadera also testified that, apart from the forms, no one at Palos informed her, and she did not ask, whether any of the doctors providing care to her father were employees or agents of Palos.

¶ 10     After being seen in the emergency room, Mizyed was admitted to the hospital on the evening of January 26, 2009. In conjunction with his admission, Mizyed signed another form dated January 26, 2009, entitled "Consent to Hospital Care." The introductory paragraphs of that form contain language identical to that of the first two paragraphs of the "CONSENT FOR

EMERGENCY TREATMENT" form, including the bolded statement: "I understand that all physicians providing services to me *** are independent medical staff physicians and not employees or agents of Palos Community Hospital." In the "Consent to Hospital Care" form, that statement is followed by paragraphs entitled "Notice of Privacy Practices and Release of Information," "Payment Guarantee/Assignment of Insurance Benefits," and "Responsibility for Personal Properties."

¶ 11    Mizyed acknowledged that he signed this document. At her deposition, Nadera also acknowledged that she encouraged her father to sign it, explaining she "did not exactly go line to line to read [it] because at that moment, honestly, I was like, okay, this is just a consent ***. So, I did not take the time *** to kind of go over every detail in the paper, just trusting that this is a consent for his medical."

¶ 12    On January 27, 2009, Mizyed signed a third separate consent form to undergo a cardiac catheterization procedure. That form is dated January 27, 2009 and indicates it was signed at 10:10 a.m. That form consists of 12 numbered paragraphs. The first numbered paragraph described the procedure and–as in the two prior consent forms–stated that the treating physicians were *not* Palos' employees or agents:

> "I authorize and consent to have Drs. Camba, Everett, Sullivan or West and such assistants as [they] may designate to perform a procedure known as Cardiac Catheterization ***. Additional procedures including coronary device-based interventions and/or select noncoronary angiographic studies may be performed as deemed necessary. *I understand that all physicians providing services to me, including emergency room physicians, radiologists, pathologists, anesthesiologists, my attending physician and physician consultants, are independent medical staff physicians and not employees or agents of Palos Community Hospital.*" (Emphasis added.)

At his deposition, Mizyed acknowledged that he signed this form and testified that "maybe Nadera" was there at the time. However, Nadera testified that she had not seen this particular consent form, as she was not present at the hospital during the morning of January 27, 2009.

¶ 13    Mizyed additionally signed a separate "Consent to Operation" form, which is also dated January 27, 2009 at 10:10 a.m. and contains nine numbered paragraphs. The first paragraph states that Mizyed "authorize[s] the performance upon myself of the following surgical operation[:] emergency coronary artery bypass grafts." The second paragraph consisted of the bolded statement: "I understand that all physicians providing services to me, including emergency room physicians, radiologists, pathologists, anesthesiologists, my attending physician and physician consultants, are independent medical staff physicians and not employees or agents of Palos Community Hospital." At his deposition, Mizyed acknowledged that he signed that form. Nadera also testified that she had seen this form[2] and "told my dad to sign here, consent about the surgery."

---

[2]Both the "Consent to Operation" form and the "Consent for Procedure Catheterization" form reflect that they were signed at 10:10 a.m. on January 27, 2009. Assuming both forms were signed at that time, Nadera's testimony that she saw her father sign the "Consent to Operation" form appears to be inconsistent with her testimony that she was not present for the signing of the "Consent for Procedure Catheterization" form.

¶ 14 The following day, January 28, 2009, Mizyed underwent coronary artery bypass surgery. Two days after the surgery, on January 30, 2009, Mizyed underwent a procedure to place a peripherally inserted cardiac catheter (PICC line). A fifth form, entitled "CONSENT FOR PROCEDURE" and dated January 30, 2009, indicates that it contains Mizyed's consent to the PICC line insertion.

¶ 15 That consent form for the PICC line procedure consists of 13 numbered paragraphs. The second paragraph of the form, as in the prior consent forms, consisted of the bolded statement: "I understand that all physicians providing services to me, including emergency room physicians, radiologists, pathologists, anesthesiologists, my attending physician and physician consultants, are independent medical staff physicians and not employees or agents of Palos Community Hospital."

¶ 16 At his deposition, Mizyed did not remember signing this particular form and testified that his signature on that form appeared to be different from his usual signature: "if I'm the one who signed this one, that's not really my normal signature. It's different because maybe I was not feeling well." Nadera testified that she recognized her father's signature on the PICC line consent form, but she did not recall whether she had discussed that particular form with him.

¶ 17 Mizyed remained hospitalized at Palos until February 7, 2009. In the days following the January 30 PICC line procedure, Mizyed developed a fever. Doctors at Palos, including his attending physician, Dr. Kanashiro, determined that he had developed an infection resulting from the PICC line insertion. Dr. Kanashiro testified that on February 4, 2009, the results of blood cultures confirmed that Mizyed had an infection. Dr. Kanashiro testified that she requested the assistance of a physician specializing in infectious disease to address the infection. Mizyed was subsequently prescribed vancomycin, an antibiotic. According to Mizyed's complaint, he stopped receiving vancomycin on February 6, 2009.

¶ 18 Mizyed was discharged from the hospital on the morning of February 7, 2009, with directions to take another antibiotic, amoxicillin. Dr. Kanashiro testified that the decision that Mizyed was ready for discharge was made by her in consultation with physicians from "cardiology, infectious disease and the cardiovascular surgeon. And all of them decided that the patient was able to go home." She testified that she believed Mizyed was ready to be discharged because he "was awake, responsive, [and] stable."

¶ 19 However, Mizyed and Nadera testified that Mizyed was still not feeling well when he was discharged from Palos on February 7, 2009. Nadera testified that she visited her father at his home on the same evening after he was discharged from Palos. She recalled that Mizyed appeared weak, had a fever, and complained that he was having difficulty breathing. The family called an ambulance, and Mizyed was admitted to Advocate Christ Hospital.

¶ 20 Mizyed testified that he remained at Advocate Christ Hospital for several days, where he continued to receive treatment for the infection that he had contracted at Palos. For several additional weeks, Mizyed required daily injections of antibiotics to treat the infection.

¶ 21 Mizyed filed his initial medical malpractice complaint on February 9, 2011, alleging that unidentified agents or employees of Palos had been negligent in failing to prevent, recognize, and treat his infection and had prematurely discharged him. After Palos moved to dismiss, Mizyed filed an amended complaint on October 7, 2011, which identified Dr. Kanashiro as one of his treating physicians.

¶ 22    The court subsequently granted Mizyed leave to file a second amended complaint, which was filed December 8, 2011. On January 12, 2012, Palos filed a motion to dismiss the second amended complaint. On April 11, 2012, Mizyed responded by seeking to file a third amended complaint (the complaint), attaching that pleading.

¶ 23    The complaint alleged that Palos "employed physicians," including Dr. Kanashiro, that were "actual agents and/or employees" of Palos in caring for Mizyed. The complaint alternatively alleged that Dr. Kanashiro and other physicians acted as Palos' "apparent" agents or employees. The complaint alleges that Dr. Kanashiro "was assigned to and did become [Mizyed's] attending physician" and thereafter assumed primary responsibility for his care.

¶ 24    The complaint alleges that prior to discharging him, "Palos Community Hospital, through its agent Mary Kanashiro, did not obtain confirmation that his [PICC] line-related infection was under control and manageable." As a result of Dr. Kanashiro's alleged failure to properly treat Mizyed's infection, "there was seeding of the infection in new locations" which required "an aggressive course of antibiotics" at Advocate Christ Hospital. The complaint alleges that Palos–acting through Dr. Kanashiro as its agent–was guilty of, *inter alia*: failing to obtain daily blood cultures; failing to continue antibiotics "until the blood culture was reported negative"; failing to properly manage Mizyed's infection; and discharging him without confirming that his infection was "under control."

¶ 25    On June 21, 2012, the court entered an order "dismissing all allegations of neglect" in the complaint "other than those directed at [Palos] for the actions of Mary Kanashiro, M.D.," but otherwise directed Palos to answer the complaint. On July 3, 2012, Palos filed an answer in which it admitted that Dr. Kanashiro was Mizyed's attending physician and that Mizyed had developed an infection. However, Palos denied that Dr. Kanashiro was its agent, servant or employee, and denied all allegations of negligence.

¶ 26    The parties engaged in discovery, including depositions of Mizyed, Nadera, and Dr. Kanashiro. In her deposition, Dr. Kanashiro testified that at the time of Mizyed's treatment at Palos, she was not an employee of Palos, but was employed by a corporation known as Cardiology Internal Medicine Associates. She testified that she had been "on call for the emergency department" and became Mizyed's attending physician on January 27, 2009. She explained: "When you are on call, the ER doctor calls you that there's a patient that doesn't have a doctor and you are going to be taking care." She testified that Mizyed "didn't have a doctor that was on staff in Palos. That's the way they assigned me to him."

¶ 27    Dr. Kanashiro testified that Mizyed had spoken English with her, that she believed he understood her, and that they did not require an interpreter to communicate. Dr. Kanashiro acknowledged that she never informed Mizyed that she worked for Cardiology Internal Medicine Associates and that she did not wear any badge identifying her employer. She indicated she wore a badge to signify that she was a doctor on the "staff" but did not say whether it identified her as Palos' agent or employee:

        "Q. When you do rounds and see patients like Saleh Mizyed back in February of 2009, what was the attire that you would typically wear, a white coat?
        A. A blue coat.
        Q. A blue coat. And does that have any identifying marks on it?
        A. There's a badge.
        Q. And what does the badge say?

A. That we are–belong to the medical staff, that we have privileges at Palos Community Hospital.

Q. What specifically does the badge say?

A. Medical staff.

Q. It says Palos Community Hospital?

A. That you are a doctor, you are not a nurse. Just to identify that you are a doctor."

Dr. Kanashiro agreed that Palos did not direct her care for Mizyed, but that she instead "exercise[d] [her] own independent training, skill and knowledge and medical judgment." She specifically denied that she ever told Mizyed that she was an employee or agent of Palos.

¶ 28 On April 10, 2014, Palos moved for summary judgment, arguing that the evidence demonstrated that Mizyed could not establish that Dr. Kanashiro was either an actual or apparent agent of Palos. Palos argued that Dr. Kanashiro's undisputed testimony negated any claim of actual agency, as she testified that she was never an employee of Palos and had used her independent judgment in treating Mizyed. With respect to apparent agency, Palos' motion relied largely on the consent forms signed by Mizyed acknowledging that physicians were not Palos' agents or employees. Palos argued that the explicit language of the consent forms demonstrated that Palos had *not* "held out" Dr. Kanashiro as Palos' agent or employee, precluding liability under an apparent agency theory. Palos similarly argued that the consent forms demonstrated that Mizyed could not show that Palos or Dr. Kanashiro "acted in a manner that would lead a reasonable person to conclude that Dr. Kanashiro was [Palos'] employee or agent," that Palos had acquiesced to any "holding out" by Dr. Kanashiro, or that Mizyed could have reasonably relied on such "holding out." Palos further asserted that Mizyed's inability to read English was "immaterial" since his daughter Nadera had reviewed the consent forms and directed him to sign.

¶ 29 On July 11, 2014, Mizyed filed his opposition to the motion for summary judgment. That opposition did not attempt to argue that Dr. Kanashiro was Palos' actual agent, but limited its argument to the theory of apparent agency. Citing our supreme court's decision in *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511 (1993), which set forth the requirements of an apparent agency claim against a hospital, Mizyed argued there remained triable issues of fact as to: whether Palos or Dr. Kanashiro acted in a manner that would lead a reasonable person to conclude that she was Palos' agent, "whether the acts of the alleged agent created the appearance of authority" that was known or acquiesced to by Palos, and whether Mizyed "acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence."

¶ 30 Palos filed its reply in support of its motion for summary judgment on July 28, 2014, arguing that it had "clearly notified both the plaintiff and his daughter that all physicians who would provide medical care to him were independently employed and were not [Palos'] employee or agent." Palos asserted that Mizyed had failed to identify any evidence that Palos or Dr. Kanashiro had "provided him with any information that was contrary" to those disclosures.

¶ 31 On August 13, 2014, the trial court entered an order granting Palos' motion for summary judgment "in its entirety." The record on appeal contains no transcript or record of proceedings from that date. On August 28, 2014, Mizyed filed a motion stating that the court had "orally pronounced its decision/order granting the defendant's motion for summary judgment" and

requesting that the court provide written findings of fact and conclusions of law concerning that order. On September 5, 2014, the trial court entered an order denying that request.

¶ 32     On September 11, 2014, Mizyed filed a notice of appeal from the August 14, 2014 order entering summary judgment in Palos' favor.

¶ 33                                              ANALYSIS

¶ 34     We note that we have jurisdiction as Mizyed perfected a timely notice of appeal from a final order entering judgment in Palos' favor. See Ill. S. Ct. R. 303(a) (eff. May 30, 2008).

¶ 35     The sole issue on appeal is whether summary judgment should have been granted in favor of Palos with respect to Mizyed's theory of liability premised on apparent agency. "Summary judgment is appropriate where the pleadings, depositions, admissions, and affidavits show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) *Hawkins v. Capital Fitness, Inc.*, 2015 IL App (1st) 133716, ¶ 10. "A triable issue of fact exists where there is a dispute as to material facts, or where, the material facts being undisputed, reasonable persons might draw different inferences from the facts." (Internal quotation marks omitted.) *Id.* "Although summary judgment has been deemed a 'drastic means of disposing of litigation' [citation], it is nonetheless an appropriate mechanism to employ to expeditiously dispose of a lawsuit when the moving party's right to a judgment in its favor is clear and free from doubt [citation]. A trial court's ruling on a motion for summary judgment is subject to *de novo* review. [Citation.]" *Lamb-Rosenfeldt v. Burke Medical Group, Ltd.*, 2012 IL App (1st) 101558, ¶ 23.

¶ 36     Mizyed's arguments in this appeal are limited to Palos' vicarious liability for the alleged negligence of his treating physicians under the theory of apparent, rather than actual, agency. In 1993, our supreme court "first applied the apparent agency doctrine in a medical malpractice context" and "addressed the question of whether a hospital may be held vicariously liable for the negligence of a physician who is not an employee of the hospital but who, rather, is an independent contractor," concluding that "a hospital may be vicariously liable under such circumstances pursuant to the doctrine of apparent agency." *York v. Rush-Presbyterian-St. Luke's Medical Center*, 222 Ill. 2d 147, 179 (2006) (citing *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511 (1993)).

¶ 37     "[P]ursuant to the doctrine of apparent authority, '[a] principal will be bound not only by that authority which he actually gives to another, but also by the authority which he appears to give. Apparent authority in an agent is the authority which the principal knowingly permits the agent to assume, or the authority which the principal holds the agent out as possessing. It is the authority which a reasonably prudent person, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess.' " *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 24 (quoting *Gilbert*, 156 Ill. 2d at 523).

¶ 38     Under *Gilbert*, "a hospital may be found vicariously liable under the doctrine of apparent agency for the negligent acts of a physician providing care at a hospital, 'regardless of whether the physician is an independent contractor, unless the patient knows, or should have known, that the physician is an independent contractor.' " *York*, 222 Ill. 2d at 184 (quoting *Gilbert*, 156 Ill. 2d at 524). The *Gilbert* decision "set forth the three elements a plaintiff must plead and prove to hold a hospital vicariously liable under the apparent agency doctrine." *Id*. In particular, *Gilbert* held:

" 'For a hospital to be liable under the doctrine of apparent authority, a plaintiff must show that: (1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, the plaintiff must also prove that the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence.' [Citation.]" (Internal quotation marks omitted.) *Id.* at 184-85 (quoting *Gilbert*, 156 Ill. 2d at 525).

"To survive a defendant hospital's motion for summary judgment on a claim of apparent agency, a plaintiff must present at least some evidence to satisfy each of the *Gilbert* factors." *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 25. As set forth below, we conclude that Mizyed did not do so in this case.

¶ 39    "The first two *Gilbert* elements are frequently grouped together and have been referred to as the 'holding out' factor. [Citation.] The focus of this factor is whether or not 'the patient knows, or should have known, that the physician is an independent contractor.' " [Citation.] *Id.* ¶ 26. "Regarding 'holding out,' if a patient has actual or constructive knowledge that the doctor is an independent contractor, the hospital is not vicariously liable. The hospital prevails on this element if 'the patient *is in some manner put on notice of the independent status of the professionals with whom he might be expected to come into contact.*' " (Emphasis added.) *Steele v. Provena Hospitals*, 2013 IL App (3d) 110374, ¶ 138 (quoting *York*, 222 Ill. 2d at 182).

¶ 40    "Although not dispositive of the 'holding out' factor, whether a patient signs a hospital consent to treatment form that contains clear and unambiguous independent contractor disclaimer language is an important factor to consider with respect to this factor because it is unlikely that a patient who signs such a form can reasonably believe that [his] treating physician is an employee or agent of a hospital when the form contains specific language to the contrary." *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 27. In fact, the Third District of our court "has held that such consents are 'almost conclusive' in determining whether a hospital should be held liable for the medical negligence of an independent contractor." *Steele*, 2013 IL App (3d) 110374, ¶ 131 (quoting *Thede v. Kapsas*, 386 Ill. App. 3d 396, 401 (2008)).

¶ 41    In this case, Palos argues that Mizyed cannot meet the "holding out" element of its apparent agency claim, in light of the consent forms he signed indicating that his treating physicians were independent contractors. As Palos notes, in a number of decisions, our court has sustained summary judgment against plaintiffs who have signed consent forms explicitly disclosing that their treating physicians were not agents or employees of the hospital. See, *e.g.*, *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 28 (affirming summary judgment in favor of hospital where plaintiff's decedent signed several forms stating that " 'PHYSICIANS ARE NOT EMPLOYEES OF THE MEDICAL CENTER' and 'NONE OF THE PHYSICIANS WHO ATTEND ME AT THE HOSPITAL ARE AGENTS OR EMPLOYEES OF THE HOSPITAL' "); *Wallace v. Alexian Brothers Medical Center*, 389 Ill. App. 3d 1081, 1083 (2009) (hospital entitled to summary judgment where consent form stated " 'I understand that physicians who provide professional services to me such as my attending physician *** are not the employees or agents of [the hospital], but they are independent contractors' "); *Churkey v. Rustia*, 329 Ill. App. 3d 239, 241 (2002) (affirming summary judgment where consent form stated that the hospital " 'uses independently contracted physicians ***. The physicians are not

employees of Sherman Hospital but have been granted privileges to practice at the institution ***.' "); *James v. Ingalls Memorial Hospital*, 299 Ill. App. 3d 627, 629 (1998) (affirming summary judgment where patient signed consent form stating that " 'the physicians on staff at this hospital are not employees or agents of the hospital, but independent medical practitioners who have been permitted to use its facilities for the care and treatment of their patients' ").

¶ 42      On the other hand, the signing of a consent form will not preclude recovery under an apparent agency theory if it is ambiguous or potentially confusing as to whether one or more of the plaintiff's treating physicians are agents of the hospital or independent contractors. For instance, our supreme court upheld a jury verdict against a hospital, premised on an apparent agency theory, despite the patient's signing of a consent form that authorized " 'Dr. Rosenberg and such assistants and associates as may be selected by him *** and the [hospital] to perform' " procedures. *York*, 222 Ill. 2d at 196-97. Our supreme court noted that the consent form "nowhere stated that plaintiff would be treated by independent-contractor physicians," and agreed with the appellate court that " 'the language of the consent [form] providing that [the hospital] could select physicians to assist *** could reasonably be interpreted as allowing [the hospital] to select anesthesiologists.' " *Id.* at 197 (quoting *York v. El-Garizouri*, 353 Ill. App. 3d 1, 30-31 (2004)).

¶ 43      Similarly, our court has reversed the trial court's entry of summary judgment in favor of a hospital when the consent form was arguably confusing. In *Schroeder v. Northwest Community Hospital*, 371 Ill. App. 3d 584 (2006), the patient or his wife had, on three occasions, signed a consent form containing six sections. *Id.* at 587. The defendant hospital had obtained summary judgment in reliance on the second section, which provided:

> " '*Item 2 disclosure Statement:* Your care will be managed by your personal physician or other physicians who are not employed by [the hospital] but have privileges to care for patients at this facility. Your physician's care is supported by a variety of individuals employed by [the hospital], including nurses, technicians and ancillary staff. Your physician may also decide to call in consultants who practice in other specialties and may be involved in your care. Like your physician, those consultants have privileges to care for patients at this facility, but are not employed by [the hospital].' " (Emphasis added and omitted.) *Id.* at 587.

The *Schroeder* plaintiff had argued that the form "was 'extremely confusing' and ambiguous because it did not state in a clear fashion that the doctors who would be caring for decedent were not hospital employees or agents, and it could reasonably be interpreted to mean that his personal physicians were employed by Northwest but the other unidentified physicians, who might be involved in his care were not." *Id.* at 589.

¶ 44      Our court reasoned:

> "[W]e believe the issue is not whether plaintiff was confused or led to believe by any actions on the part of Northwest that the physicians were its agents or employees but whether decedent was confused or misled by the disclosure forms and whether he perceived or believed the physicians were the agents or employees of Northwest. Obviously, if he knew or should have known that the defendant physicians were independent contractors, then the hospital is not liable. *Gilbert*, 156 Ill. 2d at 523. If, however, there is evidence that decedent reasonably believed his personal care physician and the consulting physicians were agents or employees of the hospital, a triable issue of fact exists and should be presented to a jury. We believe there is

sufficient material evidence on this issue of apparent agency which should be submitted to the trier of fact, and that, therefore, summary judgment was inappropriate." *Id.* at 593-94.

¶ 45 Likewise, in *Spiegelman v. Victory Memorial Hospital*, 392 Ill. App. 3d 826 (2009), our court upheld a jury verdict against a hospital after concluding that, due to the ambiguous consent form, "the jury could rightfully infer that plaintiff was confused as to which doctors were employees of the hospital and which were independent contractors." *Id.* at 837. The *Spiegelman* plaintiff had signed a nine-paragraph consent form in which the third paragraph stated: " 'I am aware that during my visit ***, hospital employees will attend to my medical needs as may be necessary. I understand that these individuals may carry out a part or all of my treatment ***.' " *Id.* at 829. The fourth paragraph then stated:

> " 'I understand that the Emergency Department physician and my attending physician are independent contractors and not agents or employees of [the hospital]. *** I am also aware that any other physicians who may be called to attend my care are independent contractors and not employees or agents of [the hospital].' " *Id.*

¶ 46 Although the hospital sought to rely on the statements in the fourth paragraph, our court found that "it d[id] not adequately address the ambiguity created by the rest of the form." *Id.* at 837. Our court's decision in *Spiegelman* noted that, as in *Schroeder,* "the consent utilized a multipart format and contained various provisions unrelated to the independent contractor disclaimer." *Id.* (citing *Schroeder*, 371 Ill. App. 3d at 587). Our court emphasized that "immediately preceding the paragraph containing the disclosure is a paragraph stating: 'I am aware that during my visit to the Emergency Department *** *hospital employees* will attend to my medical needs as may be necessary.' " (Emphasis in original.) *Id.*

¶ 47 In applying the foregoing precedent in this appeal, we first acknowledge that this case presents additional factual circumstances not described in those cases–namely, Mizyed's limited English proficiency and his inability to read in *any* language. Mizyed relies primarily on these facts to argue that Palos cannot rely on any of the English-language consent forms to support summary judgment.

¶ 48 Notably, Mizyed does not identify any cases holding that a non-English speaking or illiterate patient cannot be held to the terms of a consent form that he signs. Rather, he claims that he cannot be deemed to have received notice of, or that he gave "informed consent" to, the provisions of the consent form. His argument cites Black's Law Dictionary's definitions of "notice" and "consent" to argue that the hospital was obligated to ensure his actual, subjective understanding of the statements in the forms he signed. He claims "a patient cannot be considered to have notice of *** the independent contractor status of physicians if he lacks the ability to read English and the party who wishes to impose such notice on the patient does not take the time to actively ensure understanding."

¶ 49 Similarly, analogizing to the concept of a patient's "informed consent" to permit a medical procedure, he argues that the hospital was obligated to ensure that Mizyed actually understood the legal significance of the statements in the consent form. He suggests that it was not sufficient for the hospital to provide him with English language forms, but that the hospital was obligated to provide oral Arabic translation for the consent forms to have any effect: "absent the hospital and the physicians explaining all of the contents of the forms to [him], the consent that was actually obtained would be limited only to that which was explained to him orally by the hospital and the physicians." He argues that since "none of these consent forms were read

- 11 -

to [Mizyed] or explained to him by any of the health care professionals" at Palos, there is a "genuine issue of material fact as to whether [he] reasonably believed that Dr. Kanashiro was an agent of and part of the medical staff of Palos Community Hospital."

¶ 50    The parties do not identify any cases applying the "holding out" requirement under *Gilbert* where, as here, the patient claims that he could not understand the forms he signed due to his inability to speak or read English. Nonetheless, we find Mizyed's arguments unavailing as they conflict with well-settled precedent regarding: (1) the requisite notice sufficient to defeat the "holding out" element of an apparent agency claim and (2) the effect of signing a document, even where the signing party claims not to have read or understood it.

¶ 51    First, the case law discussing the "holding out" element under *Gilbert* clearly does *not* require that the hospital ensure *actual* notice to defeat an apparent agency claim. Our court has stated that the "focus" of the "holding out" element is "whether or not 'the patient knows, *or should have known*, that the physician is an independent contractor.' " (Emphasis added.) *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 26 (quoting *Gilbert*, 156 Ill. 2d at 524). Rather than requiring proof of the patient's subjective understanding, our court has explained that if a plaintiff is "*placed on notice* of the independent contractor status of [her] doctors, it would be unreasonable of her to assume that they were employed by defendant and, thus, she could not sustain an apparent agency claim." (Emphasis added and internal quotation marks omitted.) *Wallace*, 389 Ill. App. 3d at 1087. Thus, "if a patient has actual *or constructive knowledge* that the doctor is an independent contractor, the hospital is not vicariously liable." (Emphasis added.) *Steele*, 2013 IL App (3d) 110374, ¶ 138. We decline Mizyed's invitation to depart from this precedent to require the hospital to prove the patient's actual knowledge if the patient does not understand English.

¶ 52    In order for Palos to avoid apparent agency liability, there was no duty on the hospital's part to determine Mizyed's education or to ensure his subjective understanding of the English language consent forms. The hospital need only show that (through the use of consent forms or otherwise) Mizyed had been *placed on notice* regarding the relationship between his treating physicians and the hospital. Notably, the deposition testimony regarding the role of Mizyed's adult daughter, Nadera, confirms that Mizyed was placed on such notice. Nadera, who admittedly understood English, acknowledged that she reviewed and encouraged Mizyed to sign multiple consent forms containing the express disclosure that his treating physicians were not agents or employees of the hospital. Although Nadera admitted that she had not read the forms completely before encouraging her father to sign, Palos had no reason to doubt that she had fully read and understood the forms and accurately communicated them to her father before he signed, indicating his understanding and consent. Further, there is no testimony suggesting that Mizyed or Nadera asked Palos for any clarification of any terms in the forms. Under these circumstances, the hospital could rely on Mizyed's signing of the documents as evidence of his understanding of their terms, notwithstanding his subsequent claims that he did not subjectively understand them.

¶ 53    Moreover, Mizyed does not cite Illinois precedent to suggest that English-language consent forms are not sufficient to put a non-English speaker on notice of their terms. We agree with Palos that our supreme court's decision in *Hernandez v. Department of Labor* weighs against such an argument. See 83 Ill. 2d 512, 514 (1981) (rejecting Spanish speaker's argument that his untimely appeal from agency's denial of unemployment benefits should be allowed

because the written notice informing him of his appeal deadline was in English and had been "mistranslated" by his friend).

¶ 54 Furthermore, Mizyed's arguments ignore the long-standing principle that one who signs a document is charged with knowledge of its contents, regardless of whether he or she actually read the document. Mizyed's reply brief suggests, without citing applicable authority, that "[a] patient's signature on a hospital 'consent' form does no more than create a rebuttable presumption that the contents of the form was read, understood, and agreed-to." However, it is well settled that: "Generally, absent fraud, the act of signing legally signifies that the individual had an opportunity to become familiar with and comprehend the terms of the document he or she signed. An individual 'who has had an opportunity to read a contract before signing, but signs before reading, cannot later plead lack of understanding.' [Citation.]" *Hawkins v. Capital Fitness, Inc.*, 2015 IL App (1st) 133716, ¶ 14.

¶ 55 Relying on his inability to read, Mizyed argues that the only way he would know that his physicians were not employees "would be if they told him (which they did not) or he was able to read English." Nonetheless, our supreme court has held that illiteracy does *not* exempt a party from the terms of the document he signs. See *Shulman v. Moser*, 284 Ill. 134, 140 (1918) ("Illiteracy is not a defense to a contract, and if a party to a contract cannot read an instrument it is as much his duty to have it read to him before he signs it as it would be to read it before signing it if he were able to do so. [Citation.] One who is unable to read is not permitted to make contracts without the usual precaution to ascertain what they contain."). Thus, although he may not have been able to read the consent forms, his decision to sign them legally signifies that he "had an opportunity to become familiar with and comprehend" their terms. *Hawkins*, 2015 IL App (1st) 133716, ¶ 14.

¶ 56 We additionally recognize the testimony that Mizyed relied on his adult daughter Nadera's recommendation to sign at least some of the consent forms, but do not find that this creates any issue of fact on the "holding out" element. It is undisputed that Nadera was fluent in English. Neither Mizyed's nor Nadera's testimony suggested that Palos impeded their understanding of the explicit language in the consent forms regarding the independent contractor status of Mizyed's treating physicians. Although Mizyed's appellate argument faults Palos for not providing Arabic translation of the consent forms, there was no testimony that Mizyed or Nadera had ever asked for Arabic translation assistance or that Palos had ever denied such a request. Rather, Nadera (who acknowledged that she had no difficulty reading English) candidly admitted that she "did not take the time" to read the forms in their entirety but nonetheless encouraged her father to sign the forms to obtain treatment. Nadera also specifically denied asking anyone at Palos any questions about those forms. Further, there was no testimony suggesting that anyone at Palos misrepresented whether any of the treating physicians were agents or employees of the hospital; rather, both Mizyed and Nadera acknowledged that the subject was simply not raised in their discussions at Palos.

¶ 57 Under these circumstances, we conclude that Mizyed's inability to read or speak English does not undermine the effect of the consent forms that he signed. In turn, we conclude that the explicit language of those consent forms put him on notice that his treating physicians were not Palos' agents or employees, defeating his apparent agency claim.

¶ 58 We reiterate that "actual or constructive knowledge that the doctor is an independent contractor" precludes the "holding out" element of an apparent agency claim. *Steele*, 2013 IL App (3d) 110374, ¶ 138. "The hospital prevails on this element if 'the patient is in some

- 13 -

manner put on notice of the independent status of the professionals with whom he might be expected to come into contact.' [Citation.]" *Id*. Given the explicit language contained in the multiple forms that he signed, we find that Mizyed was put on notice and had at least constructive knowledge that his physicians were not Palos' agents or employees.

¶ 59     The evidence is undisputed that Mizyed signed multiple consent forms, each of which explicitly stated that "all physicians providing service to me, including *** my attending physician *** are independent medical staff physicians and not employees or agents of Palos Community Hospital." Mizyed conceded at his deposition that he had signed four consent forms (and his daughter Nadera identified his signature on a fifth form).

¶ 60     We acknowledge that the consent forms at issue in this case used "a multipart format and contained various provisions unrelated to the independent contractor disclaimer"; in this respect they resemble the consent forms found insufficient to defeat an apparent agency claim in *Spiegelman* and *Schroeder*. *Spiegelman*, 392 Ill. App. 3d at 837 (citing *Schroeder*, 371 Ill. App. 3d at 587). However, as our court discussed in *Lamb-Rosenfeldt*, the mere fact that a consent form "contain[s] multiple parts" and "sections unrelated to the physician disclaimer" does not necessarily undermine the effect of otherwise explicit disclosures that physicians are independent contractors. See *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 30 (finding the form at issue in *Schroeder* distinguishable because it "did not contain key phrases like 'independent contractor' or 'independent physician' ").

¶ 61     We likewise find that *Schroeder* and *Spiegelman* are distinguishable, since those two cases concerned consent forms whose language was ambiguous as to whether certain doctors may or may not be agents or employees of the defendant hospital. See *Spiegelman*, 392 Ill. App. 3d at 837 (consent form could be found confusing where statement that doctors were independent contractors was preceded by statement that " '*hospital employees* will attend to my medical needs' " (emphasis in original)); *Schroeder*, 371 Ill. App. 3d at 589, 593 (finding issue of fact as to "whether decedent was confused or misled by the disclosure forms" where plaintiff argued that consent form "did not state in a clear fashion that the doctors who would be caring for decedent were not hospital employees or agents").

¶ 62     In contrast, each consent form signed by Mizyed in this case explicitly stated that "*all* physicians providing services to [Mizyed]," including his "attending physician,"[3] were "independent medical staff physicians and not employees or agents" of Palos. (Emphasis added.) Such unambiguous language is akin to the explicit statements relied upon by our court in upholding summary judgment orders dismissing similar vicarious liability claims. See, *e.g.*, *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 28 (" 'PHYSICIANS ARE NOT EMPLOYEES OF THE MEDICAL CENTER' " and " 'NONE OF THE PHYSICIANS WHO ATTEND ME *** ARE AGENTS OR EMPLOYEES OF THE HOSPITAL.' "); *Wallace v. Alexian Brothers Medical Center*, 389 Ill. App. 3d 1081, 1083 (2009) (" 'I understand that physicians who provide professional services to me such as my attending physician *** are not the employees or agents of [the hospital], but they are independent contractors ***.' ").

---

[3]The fact that each form specified that Mizyed's "attending physician" was not a Palos employee is particularly significant in this case, since the trial court (in an order not challenged by Mizyed on appeal) expressly dismissed Mizyed's complaint except with respect to the allegations concerning his attending physician, Dr. Kanashiro.

¶ 63    The consent form, by itself, would not necessarily warrant summary judgment in Palos' favor if there was other evidence that Palos was "holding out" Dr. Kanashiro as its agent or employee. See *Churkey v. Rustia*, 329 Ill. App. 3d 239, 245 (2002) ("There certainly could be situations in which a patient signed a consent form *** but additional facts exist that would create a triable issue of fact as to whether the hospital held the defendant physician out as its agent."). However, the record on appeal in this case indicates no other evidence to support the "holding out" element. Dr. Kanashiro specifically denied that she ever represented that she was an employee or agent of Palos, verbally or otherwise. Further, she testified that her badge only said "medical staff" and she did not indicate that her badge identified her as a Palos employee. Moreover, neither Mizyed's nor Nadera's deposition testimony suggested that they had inquired, or that anyone ever told them, whether any treating physicians were agents or employees of Palos.

¶ 64    As in *Churkey*, we conclude that "the lack of any facts showing that the hospital 'held out' Dr. [Kanashiro] as its agent, coupled with the signed consent form[s] *** leads us to conclude, as a matter of law, that [Mizyed] knew or should have known that Dr. [Kanashiro] was not the hospital's agent." *Id.* As Mizyed failed to present a sufficient factual basis to satisfy the "holding out" element of his apparent agency claim, the trial court correctly entered summary judgment dismissing his vicarious liability claim against Palos.

¶ 65    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 66    Affirmed.